PAUL A. BONIN, Judge.
h Christopher Wells shot and killed Brandon “Big Herb” McCue. Charged with second degree murder, Mr. Wells claimed before the jury that he acted in self-defense. A unanimous jury convicted him of manslaughter, an authorized responsive verdict. The trial judge imposed a sentence of twenty-five years. Mr. Wells appeals both his conviction and his *153 sentence. He assigns twenty-seven errors.
At the outset of our discussion, we importantly emphasize that we do not resolve the issues presented in this appeal under the provisions of Louisiana’s “stand-your-ground” law. See La. R.S. 14:20 C. We do, however, decide the matter on a reversible error in the instructions given to the jury, which instructions permitted the jury to consider the possibility of retreat by Mr. Wells as a factor in determining whether Mr. Wells had a reasonable belief that deadly force was reasonable and apparently necessary to prevent his killing by Big Herb McCue. See La. R.S. 14:20 D.
Turning to the specific assignments of error which we now consider, we first understand Mr. Wells to seek a Jackson v. Virginia review for sufficiency of 12evidence on his argument that the prosecution did not discharge its obligation to prove beyond a reasonable doubt that Mr. Wells did not act in self-defense.[1] We consider this claim first because Mr. Wells would be entitled to an acquittal if the evidence is insufficient to sustain a guilty verdict. We have reviewed all the evidence under the Jackson v. Virginia standard and are satisfied that any rational trier of fact considering all the evidence in the light most favorable to the prosecution could find beyond a reasonable doubt that Mr. Wells did not act in self-defense.
We next consider the central and recurring issue in his appeal which relates to whether Mr. Wells was entitled to have the jury decide his justification defense after an instruction that it was not to consider the possibility or opportunity on his part to retreat. Mr. Wells particularly objects[2] to the trial judge’s jury instructions, wherein she permitted the jury to consider the opportunity to retreat as a factor in assessing whether the killing of Mr. McCue was necessary for Mr. Wells to preserve his own life; Mr. Wells characterizes the instruction as effectively imposing upon him a “duty to retreat” in order to benefit from the justification defense. Importantly, our finding that the guilty verdict comports with the minimum necessary for due process does not foreclose however our finding that a complained-of jury instruction was erroneous, prejudicial, and not unimportant in relation to everything else that the jury considered as revealed in the record. And, in this case, we further find that the trial judge erroneously instructed the jury that it could consider the possibility of the defendant’s retreat in assessing his claim that the killing of Big Herb was necessary to save his own life. Because we also 13find that there is a reasonable likelihood that the jury applied the erroneous instruction in a way that was prejudicial to Mr. Wells’ defense of justification and that the prosecution failed in its burden to show that the jury’s verdict was beyond a reasonable doubt unattributable to the error, we conclude that the error is not harmless. Thus, we reverse the conviction and sentence and remand this matter for a new trial.[3]
We explain our decision in greater detail in the following Parts.
*154 I
In this Part we set out first the unchallenged facts and then turn to a summary of the testimony of the witnesses at trial. Because, as we shall shortly explain, this case is rife with factual disputes, contradictions, discrepancies, and inconsistencies, we begin our discussion with those factual matters about which there is no dispute or challenge.
A
There is no dispute that Big Herb[4] was killed by Mr. Wells. The shooting occurred in the parking area of the trailer park on Chef Menteur Highway where Big Herb lived. The coroner’s autopsy established that Big Herb suffered four close range (i.e., within four feet), frontal entry gunshot wounds, which caused massive internal bleeding. The mortal wound pierced his central left chest, heart, diaphragm, liver, right kidney, and right adrenal gland. The coroner recovered two |4bullets during the autopsy. Additional chemical testing revealed marijuana residue in Big Herb’s blood.
At the scene of the shooting police investigators recovered four spent bullet casings, three from a .380 caliber firearm— found near the decedent’s left arm — and the other from a .40 caliber weapon. They also recovered one 9mm bullet, one .40 caliber cartridge case, a clip for a semiautomatic weapon, a Days Inn Hotel key, a black shirt, a camouflage vest, and a cell phone. The investigators matched the two .380 caliber bullets collected from the autopsy with the Highpoint .380 caliber semiautomatic pistol which Mr. Wells admittedly owned and used in the shooting, and which the police confiscated from his house. As a result of a court-authorized search of Mr. Wells’ car, the investigators located and confiscated one Bryco Arms Jennings 9mm handgun, which had one live round of ammunition chambered and four live rounds of ammunition in the magazine. The gun was wedged between the driver’s seat and the center console of Mr. Wells’ vehicle. The 9mm handgun belonged to Big Herb and was in his possession at the time of the shooting.
At the time of the shooting, the two men, Big Herb and Mr. Wells, were not alone. Alton “Pound” McCue, the decedent’s brother, was definitely present as was Derrick Richard, who had accompanied Mr. Wells to the trailer park. Pound testified at the trial; Mr. Richard did not.[5]
After the shooting, the defendant grabbed Big Herb’s gun and drove away; most likely Mr. Richard was in the car with him. Because Mr. Wells had lived with the McCue family some years before, there was no question of Pound’s 1 ¿identification of him to the police. The police arrested Mr. Wells on the evening of the day of the killing, and, following advisement of his rights under Miranda, Mr. Wells made a statément in which he admitted to kñling Big Herb.
B
We now turn to consider the conflicting testimony of the trial witnesses.[6] We first note, however, that there may well have been additional witnesses at the scene of the shooting, but their presence or exis *155 tence is disputed. John Hooks, corroborated by Pound, testified that he was present, but Mr. Wells disputes that. Similarly, Pound and Mr. Hooks testified that a man called “Cash” was present, which Mr. Wells also disputes.[7] Here, in any event, we will limit our discussion to the testimony of Pound, Mr. Wells, and Mr. Hooks. We particularly focus on their testimony as it illuminates the issue of self-defense.
1
We start with Pound’s testimony. Pound testified that he went to the trailer park on Chef Menteur Highway to visit his friend, Jeremiah, who' along with John Hooks, “Cash” and Big Herb were there listening to music and smoking marijuana. Pound also saw the defendant there. He referred to the defendant as a friend. According to Pound, on the day of the shooting, Mr. Wells first came to the trailer park to buy marijuana from Big Herb. Big Herb told Mr. Wells that he did not have any, so the defendant drove away.
Pound further testified that the defendant returned to the trailer park a short time later, this time accompanied by Derrick Richard. The defendant parked his | fiImpala in front of Big Herb’s Suburban. The defendant and Mr. Richard approached Big Herb, who was seated in his Suburban. Mr. Wells asked Big Herb about a gun that belonged to Mr. Wells’ friend, and as he did so, the defendant apparently noticed that Big Herb had a 9mm gun in the Suburban. Pound stated that the defendant asked Big Herb why he needed a gun, to which Big Herb replied, “for protection.” The defendant kept asking the same question, trying, according to Pound, to provoke Big Herb and to get the weapon away from him. When Big Herb stepped out of the Suburban, the defendant returned to his vehicle and took a swig of vodka as he retrieved his gun from the back seat of his car.
The two continued to argue, and then, according to Pound, the defendant shot the victim. Pound testified that Big Herb never threatened or pointed his gun at the defendant. When Pound heard the second of four gunshots, he ran home.
Pound admitted that he had been accepted into the district attorney’s Diversion Program for possession of marijuana third offense, a felony. That action occurred after his brother’s murder and before he testified at trial. Pound denied being offered a deal for his trial testimony.[8]
We momentarily digress to point out that the defense was first informed on the day of the trial that Pound was going to testify that Big Herb was in possession of a gun and was in fact holding, although not pointing, a gun at the time. Mr. Wells’ defense counsel expressed surprise because such information, critical to the defense of justification, had not been previously disclosed by the prosecution. Pound had not mentioned Big Herb’s gun to the police in the statements he gave to investigators. The record reveals that Pound told the prosecutors about Big Herb’s fyweapon less than three months after the shooting but the prosecutors withheld this information from the defense for more than a year and a half. During cross-examination, Pound explained that he never told the police about the gun because the police never asked him about one.
*156 2
John Hooks testified that he was present when Big Herb was shot and killed. He recalled that the defendant drove up into the trailer park, near Big Herb’s Suburban, and he engaged Big Herb in conversation. Mr. Hooks was standing on the other side of Big Herb’s trailer at the time. Mr. Hooks testified that Mr. Wells was unarmed when he began speaking with Big Herb, although Big Herb was holding a gun. Shortly after the argument began, however, Mr. Hooks. observed the defendant retrieve a gun from his vehicle and approach Big Herb to continue their argument. . Big Herb was just holding his gun in his hand; he neither pointed nor threatened the defendant with the gun.' On the other hand, Mr. Hooks also testified that he did not see Mr. Wells point or fire his gun at Big Herb. Mr. Hooks was, presumably, looking away when the shooting occurred. He testified, however, to hearing gunshots. When the shooting began, Mr. Hooks ran and dropped his cell phone at the scene. Despite not having seen the shooting, Mr. Hooks identified the defendant in court as the man who shot Big Herb.
Mr. Hooks admitted to convictions for cocaine and marijuana. On cross-examination, when asked whether he had received any inducements to give testimony in the case, Mr. Hooks unexpectedly testified that he had been threatened or coerced by his probation officer that his probation would be revoked if he did not testify. Both the prosecutor and the defense counsel expressed | ¡¡surprise and assured the trial judge that this was the first they knew about such an inducement. The prosecutor promised to delve further into the matter.
3
We now turn to the information which Mr. Wells offered to the jury as well as to some of the matters with which he was challenged by the prosecution.
The defendant testified that on the day of the shooting, he and Derrick Richard drove to the Chef Menteur Highway trailer park to buy marijuana from the victim. When they arrived, Big Herb and Pound were standing next to the Suburban. Mr. Wells asked Big Herb if he had any marijuana to sell. When Big Herb said no, the defendant began arguing with him — telling him that he (the defendant) knew that Big Herb had marijuana. Big Herb then pointed his 9mm weapon at Mr. Wells and told him to leave the area. The defendant walked back a step because he was afraid Big Herb was going to shoot him. When Big Herb waved the gun higher, Mr. Wells retrieved his .380 caliber weapon[9] from his car. As the defendant turned around to face Big Herb, he noticed Big Herb “messing with the slide” of the 9mm weapon. Because he feared Big Herb was going to shoot him, Mr. Wells shot first in self-defense. He testified that he did not know if Big Herb fired at him. He did not mean to kill or harm Big Herb and did not know how many times he fired his gun. After Big Herb fell to the ground, Mr. Wells retrieved the 9mm gun to prevent Pound from getting it. Mr. Wells and Derrick Richard then drove away. After dropping Derrick Richard off, the defendant drove |9to his girlfriend’s house and began smoking and drinking.[10] He stated that he was all “messed up” over having shot Big Herb.
*157 Mr. Wells testified that after his arrest he gave a tape-recorded statement to Detective Wischan[11] so that the police would know the truth about the incident. On cross-examination, he admitted that he never told the detective that Big Herb had pointed his gun at him, having only said that he told the detective that Big Herb was merely waving the gun. Moreover, Mr. Wells admitted that he told the detective that Big Herb definitely did not shoot at him.
Mr. Wells admitted to knowing John Hooks, but said that Mr. Hooks was not at the trailer park on the day of the shooting. Further, he explained that his use of the word “mistake” in a letter written to the trial judge referred to Big Herb’s death, not to any fault on his part because he acted in self-defense.[12]
Following the defendant’s testimony, the defense and the prosecution stipulated that if Meshika Thomas, a general manager at Rally’s, were to testify, she would verify that in May 2008 the defendant was a shift manager at Rally’s and that shift managers are responsible for making cash drops at the beginning of the next shift.
II
In this Part we address Mr. Wells’ contention that the evidence adduced at trial was insufficient to sustain his conviction for manslaughter. But before we | inbegin that undertaking, we first consider in a general way the offense with which Mr. Wells was charged, the offense for which he was convicted, his defense of justification in the killing, the prosecution’s contention that he was the aggressor, and the prosecution’s burden of proof.
A
“Homicide is the killing of a human being by the act, procurement, or culpable omission of another.” La. R.S. 14:29. Criminal homicide is of five grades, two of which are second-degree murder, for which Mr. Wells was indicted, and manslaughter, for which he was convicted.[13] Ibid. As applied to this case, second-degree murder is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1. Again, as applied to this case, manslaughter is, however, a homicide which would be second-degree murder “but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.” La. R.S. 14:31 A(1).[14]
It is noteworthy that “sudden passion” and “heat of blood” are not elements *158 of the offense of manslaughter; they are only mitigating factors lessening the culpability of a defendant. See State v. Lombard, 486 So.2d 106, 110 (La.1986). Manslaughter is a responsive verdict to a charge of second-degree murder, and the relevant portion of the manslaughter statute constitutes a lesser-and-included offense of the relevant portion of the second-degree murder statute. See La.C.Cr.P. art. 814 A(8). Thus, the crime with which Mr. Wells was indicted and the crime for which he was convicted both have as essential elements the intentional killing of a human being.
A homicide or the intentional killing of a human being is justifiable, however, “[w]hen committed in self-defense by one who reasonably believes that he is imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.” La. R.S. 14:20 A(l); see also La. R.S. 14:18(7) (defense of justification can be claimed “[w]hen the offender’s conduct is in defense of persons or of property under any of the circumstances described in Articles 19 through 22.”). Most importantly for Mr. Wells’ appeal, “[t]he fact that an offender’s conduct is justifiable, although otherwise criminal, shall constitute a defense to prosecution for any crime based on that conduct.” La. R.S. 14:18 (emphasis added).
Thus, there are two components necessary to invoke this defense of justification under Article 20 A(l): defendant’s reasonable belief that he is in imminent danger of losing his life or receiving great bodily harm and that the killing of the other person is necessary to save himself from that danger. But even if both necessary components are present, that is not sufficient for the justification of self-defense because not every person is entitled to claim the defense. In particular, and importantly for the prosecution’s contention, “[a] person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw or discontinue the conflict.” La. R.S. 14:21 (emphasis added). Thus, a person who has brought on the difficulty not only must withdraw from the conflict but the withdrawal must be in |1gsuch a way that the other person “knows or should know” of the desire to withdraw. If the aggressor’s withdrawal is not made sufficiently known to his adversary, he is not eligible to claim the justification of self-defense for the homicide.
This precedent obligation of the one who brings about the difficulty to “withdraw” may be contrasted with the absence of an obligation of “[a] person who is not engaged in unlawful activity and who is in a place where he or she has a right to be.” La. R.S. 14:20 C (emphasis added). Such a person “shall have no duty to retreat before using deadly force as provided for in. this Section.” Ibid. Even more so, such a person “may stand his or her ground and meet force with force.” Ibid.
When a defendant in a homicide prosecution claims self-defense, the burden is on the prosecution to prove beyond a reasonable doubt that the defendant did not act in self-defense. See State v. Taylor, 03-1834, p. 7 (La.5/25/04), 875 So.2d 58, 63, citing to State v. Brown, 414 So.2d 726, 728 (La.1982). And it is on this point that Mr. Wells stakes his claim of legal insufficiency of the evidence to support his conviction; he does not question the sufficiency of the evidence on the intentional killing of Big Herb. See, e.g., State v. Rubens, 10-1114, p. 7 (La.App. 4 Cir. 11/30/11), 83 So.3d 30, 38. See also State *159 v. Smith, 11-0664, pp. 11-12 (La.App. 4 Cir. 1/30/13), 108 So.3d 376, 384-385.
B
With these legal principles before us, we first address Mr. Wells’ claim that the evidence is constitutionally insufficient to support his conviction for the intentional killing of Big Herb. See State v. Hearold, 603 So.2d 731, 734 (La.1992) (“When issues are raised on appeal both as to the sufficiency of the evidence 113and as to one or more trial errors, the reviewing court should first determine the sufficiency of evidence.”). In reviewing for sufficiency, we consider the entirety of the evidence before the fact-finder, including inadmissible evidence which was erroneously admitted. Id. We preserve the fact-finder’s role as weigher of evidence “through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution.” Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original).
In our review of all the evidence we are determining whether there is “sufficient proof’ to support the conviction, and sufficient proof is “defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense.” Id. at 316, 99 S.Ct. 2781 (emphasis added). Thus, we are “to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable' doubt.” Id. at 318, 99 S.Ct. 2781.
“But this inquiry does not require a court to ‘ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.’ ” Id. at 318-319, 99 S.Ct. 2781, quoting Woodby v. INS, 385 U.S. 276, 282, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966) (emphasis added by Jackson). “Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Id. at 319, 99 S.Ct. 2781 (bold emphasis in original). That does not mean, of course, that every rational fact-finder would have made such a finding. See Johnson v. Louisiana, 406 U.S. 356, 362, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972) (stating: “Jury verdicts finding guilty beyond a reasonable doubt are regularly sustained even though the evidence was such that the jury would have been justified in having a reasonable doubt.”). But it does mean that when nojl4 rational fact-finder could find guilt beyond a reasonable doubt the conviction must be overturned. See State v. Mussall, 523 So.2d 1305, 1310 (La.1988).
This standard of review for sufficiency of evidence is highly deferential to the fact-finder because it “gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.” Jackson, 443 U.S. at 319, 99 S.Ct. 2781. “The criterion thus impinges upon ‘jury’ discretion only to the extent necessary to guarantee the fundamental protection of due process of law.” Id. In addition, we as “[a] reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the Jackson standard of review.” State v. Macon, 06-481, p. 8 (La.6/1/07), 957 So.2d 1280, 1285.[15] “It is not the function of an appellate court to assess credibility or re- *160 weigh the evidence.” Id., 06-481, p. 8, 957 So.2d at 1286. The Due Process Clause of the Fourteenth Amendment, the source of the Jackson standard, does not countenance, much less require, that we re-weigh testimony and witness credibility. Importantly, when we are “faced with a record of historical facts that supports conflicting inferences [we] must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.” Jackson, 443 U.S. at 326, 99 S.Ct. 2781. And “[i]f rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all of the evidence most favorable to the prosecution must be adopted.” Mussall, 523 So.2d at 1310. Therefore, in discharging our review function for sufficiency of | ir,evidence, we cannot re-weigh or re-consider reasonable inferences drawn from basic facts to ultimate facts. We must confine ourselves to questions of law except to the extent, and only to the extent, that Jackson mandates otherwise. See State v. Gilmore, 10-0059, pp. 6-7 (La.App. 4 Cir. 10/6/10), 50 So.3d 208, 212-213.
Now, Mr. Wells argues that there is a refinement or limiting principle which applies in this case because, he further argues, to the extent that the prosecution rebutted self-defense at all, its rebuttal was derived exclusively from Pound’s testimony. Mr. Wells in brief describes Pound as the aggrieved brother of the decedent, with an extensive criminal record and pending criminal charges, and as a person whose testimony was demonstrably false on numerous points and wildly inconsistent with previous statements on other points. He lists as other impediments to Pound’s credibility the recently-received favorable treatment on his third offense marijuana charge, a pending domestic abuse battery charge, the fact that he was a drug dealer, and that he was “high on drugs” at the time of the shooting.
We agree with Mr. Wells that a rational fact-finder can be “driven to have a reasonable doubt by the numerous eccentricities, unusual coincidences and lack of corroboration” in particular cases. Mussall, 523 So.2d at 1311. In Mussall the defendant was convicted of an unwitnessed daylight armed robbery on a French Quarter sidewalk solely on the testimony of a witness/victim whose testimony was, for lack of a better word, bizarre. Moreover, there was documentary evidence which indicated that belief in the truth of the victim’s version would require a belief in improbable striking coincidences, and there was an absence of corroboration of the existence of the victim’s life savings which were taken in the robbery. The Mussall court found that no rational trier of fact could have found |ififrom even the pro-prosecution view of all the evidence proof beyond a reasonable doubt. Id. at 1312.
“[I]n the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient to support a factual conclusion.” State v. Higgins, 03-1980, p. 6 (La.4/1/05), 898 So.2d 1219, 1226. In Higgins the Supreme Court determined that no rational fact-finder could find from a single eyewitness’s testimony that a killing occurred during either an armed robbery or an attempted armed robbery, and consequently there was insufficient proof to support a conviction for first degree murder, but a rational fact-finder could find from that same eyewitness’s testimony that the defendant intentionally killed the victim. Id., 03-1980, p. 17, 898 So.2d at 1232 (“Thus, while the defendant contests both of the above credibility determinations of the jury, ... one such determina *161 tion was rational and one was not.”). But see Id., 03-1980, p. 1, 898 So.2d at 1242, (Johnson, dissenting: “In my view, Ms. Brown’s testimony was riddled with contradictions, inconsistencies, and inexplicable non sequiturs which completely nullify the credibility and reliability of her identification of Higgins as the shooter. It is nonsensical to rely upon this witness’s testimony for one purpose but not the other.”).
C
Turning to the specifics of this case, Mr. Wells argues that Mr. Wells’ case for self-defense was clear and unchallenged and, to the extent that the prosecution sought to challenge the evidence of justification, was pegged entirely on the incredible testimony of Pound. We disagree in all respects.
First, Mr. Wells’ own testimony was not so clear about his defense, and in a Jackson v. Virginia review we do not confine ourselves to only the evidence 11 presented by the prosecution; we consider all of the evidence. Mr. Wells’ testimony did not overwhelmingly establish that he reasonably believed that he was in imminent danger of losing his life or that killing Big Herb was necessary to save his own. His own testimony suggested ambivalence on his part. Not until the trial did he describe Big Herb pointing the gun at him and “messing with the slide.” But in his post-arrest pre-trial statement he neglected to note these very important facts. Moreover, notwithstanding his protestations at trial, he expressed in the written letters to the judge and to Big Herb’s mother that he was sorry for the “serious and grave mistake” and his “one error in judgment.”
Second, the prosecution strongly and— to this jury — convincingly challenged the defense of justification. While Mr. Wells makes several telling arguments about the discrediting of Pound or of Mr. Hooks, he does not thereby establish that their testimony and the reasonable inferences therefrom are mcredible or implausible in the Mussall-sense. Mr. Wells surely attacked the credibility of these witnesses. He could show Pound’s bias as the brother of the decedent and his interest in possibly receiving favored treatment for serious pending criminal charges. See La. C.E. art. 607 D(1). He pointed to apparently prior inconsistent statements by Pound, especially concerning Pound’s disclosure to the police about whether Big Herb was in possession of a gun at the time. La. C.E; art. 607 D(2). He could demonstrate that Pound had a previous conviction. See La. C.E. art. 609.1 B. In a similar manner, Mr. Wells was able to attack the credibility of Mr. Hooks. But there is nothing in Mr. Wells’ impeachment of these witnesses which renders their testimony implausible, especially on the important point of whether Mr. Wells was the aggressor. Moreover, there is no appreciable contradiction or inconsistency between the testimony of Pound and of Mr. Hooks. [1SA rational fact-finder could find either or both of them credible despite the attacks on each one’s credibility. And we must emphasize that in this case there is no “irreconcilable conflict with the physical evidence.” Higgins, 03-1980, p. 6, 898 So.2d at 1226.
Consequently, reviewing the evidence in the light most favorable to the prosecution, we conclude that any rational trier of fact could find that the prosecution proved all elements of the offense, including that Mr. Wells did not act in self-defense, beyond a reasonable doubt.
Ill
We now turn to the complained-of jury instruction regarding “retreat” and explain why we find that the instruction was error *162 and that it was not harmless, thus requiring reversal and remand for a new trial.
We first relate the relevant instructions in the context in which they were given. We then address why we conclude that the complained-of instruction, to which Mr. Wells timely objected and which confusingly contravenes the legislative directive on the matter, was error on the part of the trial court.
Before we undertake that task, however, we reiterate that our decision, expressed in Part II-C, ante, that the evidence was sufficient to prove his guilt beyond a reasonable doubt (including that he did not act in self-defense), does not preclude our finding that the instructional error is not harmless. See State v. Smith, 600 So.2d 1319, 1327 (La.1992) (“To say the evidence is of minimal constitutional sufficiency, however, is not to say the erroneous instruction is unimportant in relation to it.”) See also State v. Holmes, 620 So.2d 436, 437 (La.App. 3rd Cir.1993) (“The problem with this conviction is not the sufficiency of the evidence. The problem is an erroneous jury charge.” And “[a]lthough we find [19that by Jackson v. Virginia standards, the evidence was sufficient to support a finding of a specific intent to kill, the jury did not have to make such a finding in order to convict.”).
A
Despite the special requested jury instructions submitted by Mr. Wells, and following considerable on-the-record discussion and argument, the trial judge instructed the jury on self-defense as follows:
Justifiable homicide. A homicide is justifiable, one, when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm, and that the killing is necessary to save himself from that danger; two, when committed for the purpose of preventing a -violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed, and that such action is necessary for its prevention.
The circumstances must be sufficient to excite fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.
Three, a person who is not engaged in unlawful activity and who is hi a place where he or she has a right to be shall have no duty to retreat before using deadly force as provided for in this section, and may stand his or her ground and meet force with force. -
Four, no finder of fact shall be permitted to consider the possibility of retreat as a factor in determining whether or not the person who used deadly force was reasonable and apparently reasonable to prevent a violent or forcible felony involving life or great bodily harm to prevent the unlawful — the lawful entry.

Burden of proof, justification defense. If you find that the defendant has raised the defense that his conduct was justified, the State must prove that the defendant’s conduct was not justified. Remember, the State bears the burden of proving the guilt of the defendant beyond a reasonable doubt.

Self-defense. A homicide is justifiable if committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm, and that the killing was necessary to save himself from that danger. The danger need not | go have been real, as long as the defen *163 dant reasonably believed that he was in actual danger.

Some factors that you should consider in determining whether the defendant had a reasonable belief that the killing was necessary, number one, the possibility of avoiding the necessity of taking human life by retreat; number two, the excitement and confusion of the occasion; number three, the possibility of avoiding of preventing the danger to himself by using force less than killing; and four, that the defendant’s knowledge of his assailant’s dangerous character.

Thus, if you find, number one, that the defendant killed in self-defense; and two, that the defendant believed that he was in danger of losing his life or receiving great bodily harm; and three, that the defendant believed the killing was necessary to save himself from the danger; and four, that the defendant’s beliefs were reasonable in light of the circumstances, then you must find the defendant not guilty.

Burden of proof, self-defense. A defendant who raises the defense that he acted in self-defense does not have the burden of proof on that issue. The State must prove beyond a reasonable doubt that the homicide was not committed in self-defense.

Aggressor doctrine. A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense, unless he withdraws from the conflict in good faith and in such a manner that his adversary knows, or should know, that he desires to withdraw and discontinue the conflict.

In determining whether or not the defendant was the aggressor, you must consider the nature of the confrontation and whether the victim’s actions were a reasonable response.

Thus, if you find that the defendant was the aggressor or that he brought on the difficulty, you must reject his claim of self-defense unless you find, number one, that he withdrew from the conflict and two, that his withdrawal was in good faith; and three, that he withdrew in a manner that put his adversary on notice that he wished to withdraw and discontinue the conflict.

(Emphasis added.)
The italicized portions of the foregoing instruction were apparently given in accordance with the recommended instruction set forth in a now outdated version |aiof Louisiana Civil Law Treatise, Volume 17: Criminal Jury Instructions and Procedures (2nd ed.2003).[16]
B
We first explain our reasons for finding erroneous the instructions employed in the present case by the trial judge. Since the 2006 amendments, in cases of self-defense, the Legislature — for its own policy reasons — explicitly and categorically prohibits the jury from considering the possibility of the killer’s retreat in order to determine whether the killing was “necessary” to save the killer’s own life.[17] The effect of *164 the 2006 amendments was to supplant a jurisprudential' rule deeply entrenched in Louisiana law. See State v. Wilkins, 13-2539, pp. 1-2 (La.1/15/14), 131 So.3d 839, 840 (per curiam).
One of those 2006 amendments, Article 20 D, provides:
No finder of fact shall be permitted to consider the possibility of retreat as a factor in determining whether or not the person who used deadly force had a reasonable belief that deadly force was reasonable and apparently necessary to prevent a violent or forcible felony involving life or great bodily harm or to prevent the unlawful entry.
As can be readily seen from the instructions actually given, the trial court’s instructions are clearly internally contradictory and confusing. On the one hand, |22the trial judge instructs the jury that they are specifically prohibited from considering the possibility of retreat as a factor in determining whether or not the person who used deadly force was reasonable and the actions apparently reasonable to prevent a violent or forcible felony, which instruction alone would be in accord with Article 20 D (and with Mr. Wells’ special requested jury instruction). But then, on the other hand, not much later she counters that instruction with the instruction that the jurors may consider the possibility of avoiding the necessity of taking human life by retreat when evaluating the reasonableness of the defendant’s beliefs at the time of the killing: “Some factors that you should consider in determining whether the defendant had a reasonable belief that the killing was necessary, number one, the possibility of avoiding the necessity of taking human life by retreat.”
Before the Wilkins decision we had already expressed the view that for homicides committed after the adoption of 2006 amendments, it would be error to permit the jury to consider the possibility of retreat. See State v. Mahler, 11-0857, p. 2 (La.App. 4 Cir. 2/27/13), 157 So.3d 626, 628, 2013 WL 749732 (Lombard, J., dissenting), writ denied, 13-0687 (La.11/1/13), 125 So.3d 417. There the dispositive issue was whether Article 20 D was to be applied retroactively to a homicide committed before its adoption. The majority of the split panel determined that the prohibition of the jury’s consideration of the possibility of retreat was a substantive change in the law. Id., 11-0857, p. 7, — So.3d at —. The majority opinion quoted approvingly from the Second Circuit’s description of the effect of Article 20 D: “the legislature has curtailed the evidence that may be offered by the State in proving the use of force unreasonable, and specifically has \ ^forbidden the consideration of the possibility of retreat vis-d-vis the. use of force.” Id., 11-0857, p. 6, — So.3d at —, citing State v. Ingram, 45,546, p. 10 (La.App. 2 Cir. 6/22/11), 71 So.3d 437, 445 (emphasis added).[18]
*165 We also note that Mahler accords with the Fifth Circuit’s finding that a trial court’s instruction that one of the factors that a jury could consider in a case of self-defense was “the possibility of avoiding the necessity of taking human life by retreat” was error. See State v. Kelly, 10-528, p. 8 (La.App. 5 Cir. 1/11/10), 60 So.3d 1, 5.
We acknowledge that other decisions of the intermediate appellate courts, all decided before Wilkins, take a contrary view. The First Circuit seems to suggest (without deciding) that Article 20 D only applies to a limited set of self-defense cases of which our case would not be one. See State v. Morris, 09-0422, pp. 18-20 (La.App. 1 Cir. 9/11/09), 22 So.3d 1002, 1012-1014. And the Fifth Circuit has found that Article 20 D does not preclude instructing the jury about the possibility of retreat. See State v. Seals, 09-1089, pp. 73-74 (La.App. 5 Cir. 12/29/11), 83 So.3d 285, 341-342. We, however, find the prohibition of Article 20 D to be clear, explicit, and without qualification in its application to self-defense cases. And we read Wilkins to have repudiated that line of cases in its reference to the Fifth Circuit’s decision in State v. Vedol.[19] 13-2539, p. 2, 131 So.3d at 840. Neither we, nor the trial court, are free to ignore the Legislature’s strong declaration of its public policy choice.
Thus, in light of the clarity of the Legislature’s adoption of Article 20 D and l^now in light of Wilkins as well as the unanimity among the Mahler panel members as to the scope of the prohibition set forth in the article, we discern no basis to deviate from their expression of the import and application of Article 20 D in a killing which occurred after its effective date. Thus, the trial court’s jury instructions comport neither with the directive of Article 20 D or controlling precedent.[20]
Accordingly, we find that the jury instructions which directed or authorized the jurors to consider the possibility of the defendant’s retreat in determining whether the killing was necessary were not merely confusing but also legally erroneous.
IV
Because our inquiry does not end, however, with a decision that the giving of the particular instruction at issue contravenes the clear legislative directive of Article 20 D, we turn to a review of the controlling legal precepts in deciding whether an error is nonetheless harmless and finally evaluate how important the complained-of erroneous instruction was to the issues which the jury was called upon to decide in this case.
A
A conviction will not be overturned on the grounds of an erroneous jury charge unless the disputed portion, when considered in connection with the remainder of the charge, is prejudicial. See State v. Motton, 395 So.2d 1337, 1348 (La.1981). Thus, an erroneous instruction is subject to harmless error review. See State v. Hongo, 96-2060, pp. 3-5 (La.12/2/97), 706 So.2d 419, 421-422.
We are without authority to reverse a judgment or ruling “which does not affect substantial rights of the ac *166 cused.” La.C.Cr.P. art. 921. But “[w]e have both the power and the obligation to review the record de novo to determine an error’s harmlessness.” Smith, 600 So.2d at 1326, citing Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Arizona v. Fulminante, 499 U.S. 279, 295, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).
The question becomes whether we can declare beyond a reasonable doubt that the erroneous instruction did not contribute to the jury’s finding of guilt or whether the error is unimportant in relation to everything else the jury considered, as revealed in the record. See Smith, 600 So.2d at 1326. Stated differently, the appropriate standard for determining harmless error is whether the guilty verdict was surely unattributable to the jury charge error. See Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).
In reviewing the record, however, we do not make credibility determinations or findings of fact; we are limited to determining “whether the state has met its burden of demonstrating the erroneous jury instruction did not contribute to the [defendant’s] conviction.” Smith, 600 So.2d at 1326. Importantly, we emphasize that the burden of establishing harmlessness is in this case upon the prosecution and not upon the defendant. See State v. Lewis, 12-1021, pp. 15-16 (La.3/19/13), 112 So.3d 796, 804-805, citing Chapman v. California, 386 U.S. at 24, 87 S.Ct. 824 (holding that the burden is upon the beneficiary of the error).
B
After examining the record, we cannot declare beyond a reasonable doubt that the jury’s verdict was surely unattributable to the erroneous charges. Numerous comments made by the assistant district attorney during closing ¡ ¡.¿arguments reveal that the legally erroneous concept of retreat was constantly pressed upon the jury before it left the courtroom to deliberate:
Prosecutor:
... Now, the law in this case — I think defense and I will both agree that — well, let me say this: I would argue that second degree murder is clear. This defendant killed Brandon McCue. And when he did it, he had a specific intent to kill or to cause great bodily harm. Pretty clear.
What you have to get into next is, was it a justifiable homicide? And you have to ask yourselves, did the defendant reasonably believe his life was in imminent danger? Was the deadly force he used to kill Brandon McCue, was it necessary to prevent that danger?
And let’s get into that. Was his life in danger? No one — no one has ever come forward, the defendant, anyone else, and said the victim, Brandon, was saying—
Defense Counsel:
Judge, objection on the instruction of law. He’s actually misstating the law of self-defense, your Honor.
The Court:
Ladies and gentleman, closing arguments are not to be considered as evidence in this case. These are the lawyers’ respective appreciations of their cases, and they are not evidence. They are merely that, argument.
You may continue, Mr. Ranier.
Prosecutor:
No one has ever said the victim said, I was going to kill you. The victim said he had the gun for protection. And no one, except the defendant during this trial, has said that it was aimed at him. Everything else is that he didn’t pick up *167 his gun at all or point it at the defendant at all or, in the defendant’s statement to police, that he was waving it around and moving it, but he wasn’t pointing it at him.
So the first step, did the defendant reasonably believe his life was in imminent danger? No. But let’s go on, you know, was it necessary to kill him?
|27The defendant comes to the trailer park where the victim is, blocks in the victim’s car, approaches the victim’s Suburban, starts some sort of confrontation about a gun.
The defendant got mad. He went all the way around to the driver’s side of his Impala. He stops to take a swig of vodka. He picks up his gun. He returns all the way around the Impala again, approaches the victim, comes back to him, more words. He shoots him once, twice, three, four times.
Was that necessary? Could he have gotten in his car and left? Could — was the second shot necessary? Was the third shot necessary? Was the fourth shot necessary? That’s a question—
Defense Counsel:
Judge, I’d—
Prosecutor:
—for you.
Defense Counsel:
He’s asking the jury to consider a duty to retreat, your Honor—
The Court:
Objection overruled.
Defense Counsel:
—when he said, was it necessary to get in his car?
The Court:
Objection overruled.
Prosecutor:
And that’s a good point. Because the judge is going to instruct you. She’s going to read you the law. And the law will tell you, you don’t have a duty to retreat if you’re not engaged in unlawful activity.
However—
IssPefense Counsel:
Judge, objection. That’s — he’s stating the reverse of what the law says.
The Court:
Overruled.
Defense Counsel:
The inverse.
Prosecutor:
If, like the defendant, you are engaged in unlawful activity; i.e., going to purchase an illegal drug, then that prohibition doesn’t apply to you. You, as jurors, can consider his ability to retreat, that he had an obligation to retreat.
Defense Counsel:
Judge, he is directly stating the opposite of Louisiana law.
The Court:
Overruled.
⅜ ⅜ ⅜ ⅜ ⅜
Defense Counsel:
Now, the burdens and the law, the duty to retreat — now, Mr. Ranier is going to say — well, there’s two sections of the Judge’s charge that you’re going to hear. And I want to read them both. I don’t want to hide anything from you. I don’t want it to be twisted. You’ll hear the Judge read the exact same words.
“A person who is not engaged in unlawful activity, and who is in a place where he or she has a right to be, shall have no duty to retreat before using deadly force as provided for in this section, and may stand his ground and meet force with force. No finder of fact shall be permitted to consider the possibility of retreat as a factor in determining *168 whether or not the person who used deadly force was reasonable and apparently necessary to prevent a violent or forcible felony involving life or great bodily harm to prevent the lawful injury.”
ImNow, the section that Mr. Ranier has been focusing on solely, even though you’ve heard the Judge instruct you in voir dire that there is no duty of retreat in Louisiana, is the first part. It says, “A person who is not engaged in unlawful activity,” right, “shall have no duty to retreat.”
It does not say the converse. It does not say, someone who’s doing something wrong has a duty to retreat. What it says is, if you’re in your house and somebody comes in and you pull a gun— they pull a gun, you don’t’ have to retreat. You can meet force with force. You are engaged in a lawful activity in a place where you have the right to be, shall have no duty to retreat. It doesn’t say.anyone has the duty to retreat.
Furthermore, the next sentence says, “No finder of fact,” and that is you, “shall be permitted to consider the possibility of retreat.”
Prosecutor:
Judge, I have to object. I think he’s misstating what section c means, or paragraph 3 on your jury charges.
The Court:
Ladies and gentlemen, you’re going to get the law from the Court. Please do not make statements of law or ask the jurors to commit to the law by reading the instructions.
I don’t mind, of course, your interpretation of the law. But do not make it that that is a statement of law.
Defense Counsel:
Listen to that section. I read it to you as exactly the Judge read it to you.
The Court:
But you read subsection C, which is in the instruction, and analogized it to someone being in their house and/or a place of business. And I think that’s what Mr. Ranier was objecting to. And that is sustainable. That is not what that subsection reads. It does not confine itself or—
Prosecutor:
Judge, I was—
| 3nThe Court:
Make your argument.
Defense Counsel:
Judge, I was making argument. Mr. Ranier did not even read the subsection. Well, I’ll make the argument to the jury.
[[Image here]]
Prosecutor:
He at least concedes it was a serious and grave mistake that can’t be undone. He at least concedes he was playing a grown-man’s game, “an immature, frightened, confused kid.”
Again, I don’t “kid” because it’s too— that duality. Is he Mr. Responsible that’s here today, the guy with the window? Or is he, I’m naive, I’m foolish, I don’t know what’s going on. He knows why he’s here. It’s because he shot Brandon McCue.
And he said, “An error in judgment. A mistake that’s irreversible, forever a fact.” Again, an error, a mistake, false. Those are all things. They don’t mean right. They mean wrong. Illegal.
The judge will explain the definition of justifiable homicide to you. But this was not reasonable. There was no imminent danger. There was no need for him to kill Brandon, his brother. It was not necessary.
He was engaged in unlawful activity. You can consider his retreat. He had an opportunity to get in the car and *169 leave, but he came back. He was the aggressor. They’re going to read you about the aggressor doctrine. You can’t claim self-defense if you’re the aggressive one out there.
Finally, in his statement to the police — -I mean, just get this imprinted on your brain when you go up there. “I shouldn’t have picked up the pistol. I should have just left the scene.” When you ask yourself, was it necessary for him to kill Brandon McCue—
Defense Counsel:
Judge—
Prosecutor:
—answer with his own words.
| S1 Defense Counsel:
Objection. There is no duty to retreat in Louisiana.
The Court:
Overruled.
As the foregoing interactions show, both the prosecutor and the trial court repeatedly mischaracterized Louisiana’s law on retreat in the context of self-defense. Any confusion which the jurors may have had owing to the contradictory instructions was dispelled by the trial judge’s rulings and comments during closing arguments. The jurors were told repeatedly that they were to contemplate the possibility of retreat when considering Mr. Wells’ actions. Although the jury was instructed that the arguments of counsel were not to be taken as evidence, Louisiana law also presumes that jurors ordinarily follow the instructions they are given. See Richardson v. Marsh, 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); Smith, 600 So.2d at 1326, n. 7.
Thus, when viewed in the light of these numerous incorrect statements of law, we cannot say that the jury’s verdict was surely unattributable to the clearly erroneous jury charges on retreat.
Our decision regarding the harmfulness of the jury-instruction error, however, does not rest solely upon the prosecutor’s considerable reliance on and exploitation of the trial judge’s misstatement of the controlling legal principle in his closing arguments. We also consider the plausibility of Mr. Wells’ defense of justification. Specifically, Mr. Wells testified that he panicked and shot Big Herb after Big Herb first pointed his Bryco Jennings 9mm semi-automatic pistol towards him, ordered him to leave, and then, after momentarily turning away to armj^himself, observed Big Herb “messing with the slide,” i.e., attempting to chamber a round into the gun. Mr. Wells testified that, at this point, he thought that he could be shot and then shot Big Herb in self-defense.
Although Pound testified, in contrast to Mr. Wells, that Big Herb did not point his gun at Mr. Wells, he admitted that Big Herb had been holding the gun during the argument that preceded the shooting. Although there is a factual discrepancy between Pound’s and Mr. Wells’ respective testimonies, this dispute is not so great as to render Mr. Wells’ version of events implausible.[21] Had the trial court, therefore, given the jury correct instructions on self-defense, this plausible version of events might have created sufficient reasonable doubt to acquit Mr. Wells of the prosecution’s charges. Because we find from the evidence that Mr. Wells had a plausible (or not implausible) defense that the killing of Big Herb was necessary, we cannot find beyond a reasonable doubt that the verdict in this case, as exploited *170 by the prosecutor, is surely unattributable to the jury instruction error. Accordingly, we must reverse Mr. Wells’ conviction for manslaughter and remand this matter to the trial court for a retrial.
CONCLUSION
In summary, we find that the evidence is sufficient for any rational trier of fact to find beyond a reasonable doubt that the prosecution proved all the essential elements of the offense, including that Mr. Wells did not kill in self-defense. Thus, Mr. Wells is not entitled to an acquittal on appeal. We do find, however, that the lastrial court’s jury instructions, over objection, were error that was harmful and that Mr. Wells is entitled to a new trial.
DECREE
The conviction of Christopher Wells for the manslaughter killing of Brandon “Big Herb” McCue is reversed and the sentence is vacated. The matter is remanded to the district court for further proceedings in accord with this decision.
REVERSED AND REMANDED.
LANDRIEU, J., dissents and assigns reasons.

. This is defendant's fourth assignment of error.

. These are defendant’s first, second, and third assignments of error.

. We always examine the record for errors patent under La.C.Cr.P. art. 920(2) but have detected none. Because of this disposition, we pretermit the remaining twenty-two assignments of error, which concern claims of Brady and Giglio violations, other instructional errors, erroneous evidentiary rulings, an excessive sentence, and an incomplete record on appeal. A new trial is the appropriate remedy for an erroneous jury instruction that is not harmless. See, e.g., State v. West, 568 So.2d 1019, 1025 (La.1990).

. We are referring to Brandon McCue, the decedent, and his brother, Alton McCue, by their respective nicknames Big Herb and Pound for ease of distinguishing them.

. The whereabouts of Mr. Richard were never explained.

.We do not consider the trial testimony of Deidre McCue, the decedent’s mother. She was not a witness to the shooting and most of the substance of her testimony is covered in the undisputed facts.

. Cash did not testify; there is a suggestion that he died before the trial.

. His attorney testified at the trial and corroborated Pound’s testimony that no deal was offered or accepted to induce his testimony.

. Mr. Wells explained that he had the gun because his job required him to transport money to the bank. He also said he got the gun "off the streets” because it was cheaper than having to purchase one legally.

. At trial, Mr. Wells denied talcing a swig of vodka just before the shooting began,

. The defendant’s tape-recorded statement was played, and the jury followed along with a transcription of the statement.

. In the letter to the judge, he wrote, "That night was a serious and grave mistake that can’t be undone, an immature, frighten [sic] and confused kid playing a grown man game." In an accompanying letter addressed to the decedent's mother, he writes, "My heart remains heavy and I pray this self con-deming [sic] accusing conscious [sic] would please take what it needs from me to be satisfied I ask God nightly will he please forgive me."

. The other three grades are first-degree murder, negligent homicide, and vehicular homicide.

. Even if manslaughter was not a lesser-and-included offense of second-degree murder, we would still find sufficiency of evidence to prove the elements of second-degree murder, the offense charged. See La.C.Cr.P. 814 A(3) and C; State v. Porter, 93-1106, pp. 5-6 (La.7/5/94), 639 So.2d 1137, 1141; State ex rel. Elaire v. Blackburn, 424 So.2d 246, 251-252 (La.1982); State v. Pleasant, 10-1533, p. 7 (La.App. 4 Cir. 5/18/11), 66 So.3d 51, 56.

. But for the limited exception created by Jackson "[i]n criminal cases [a court of appeal's] appellate jurisdiction extends only to questions of law.” La. Const. art. V, § 10(B). See also State v. Barthelemy, 09-0391, p. 24 (La.App. 4 Cir. 2/24/10), 32 So.3d 999, 1015.

. This volume of the Louisiana Civil Law Treatise has, since the trial of this matter, been updated to account for the changes made to La. R.S. 14:20. See, Cheney C. Joseph & P. Raymond Lamonica, Louisiana Civil Law Treatise, Volume 17: Criminal Jury Instructions and Procedures (3rd ed.2012), § 6:18, and especially under the Authors’ Comments, the discussion about option III, which would be applicable to the facts of this case. But see also State v. Hongo, 96-2060, p. 3 (La. 12/02/97), 706 So.2d 419, 421 n. 1, which cautions about the mechanical application of these resources.

. The sine qua non of the moral justification of this defense was that the killing of the other person was "necessary” but that no more *164 than necessary violence or force is used to save one's own life. The Scholastics, and most prominently the eminent Thomas Aquinas, taught that if one could avoid the harm by any means other than killing the person who was then threatening him then the killing was not necessary and therefore not justified. See Thomas Aquinas, Summa Theologica, Seconda Secondae Partis, Question 64: Murder, Article 7 (2nd Revised Edition 1920). From that moral framework, the concept developed that if the innocent person had the opportunity to retreat and thus avoid the threat to his own life he must retreat; the killing of his adversary could be justified only if there was no reasonable possibility of retreat.

. The Ingram panel was addressing Article 20 D in the context of a Jackson v. Virginia sufficiency of evidence claim, not in the context of an erroneous jury charge.

. See State v. Vedol, 12-0376, p. 7 (La.App. 5 Cir. 3/13/13), 113 So.3d 1119, 1124.

. We must note, however, that the trial judge in this case did not have the benefit of the Mahler or Wilkins decisions nor of the updated edition of Professors Joseph and La-monica’s treatise (see n.16, ante) at the time she was called upon to decide the appropriateness of the jury instructions.

. See Doyle v. Ohio, 426 U.S. 610, 61-617, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); Chapman v. United States, 547 F.2d 1240, 1249-1250 (5th Cir.1977), which analyze the constitutionality of a prosecutor's conduct in attacking the plausibility of a defense.