JAMES F. McKAY III, Chief Judge.
|,The defendant, Durrelle Bowens, appeals his conviction for the charge of manslaughter, La. R.S. 14:31, and his sentence. Based on the record before this Court, we affirm.
STATEMENT OF CASE
On July 8, 2011, the defendant, Durrelle Bowens, was indicted on one count of second degree murder of Toriano Livas and one count of obstruction of justice. The defendant entered a plea of not guilty at his arraignment on July 12, 2011. After a hearing on October 24, 2011, the trial court denied the defendant’s motions to suppress evidence and identification. On January 23, 2012, the State amended the bill of indictment, as to the obstruction of justice charge, to reflect that the obstruction of justice charge was in regards to the second degree murder of Toriano Livas. The defendant was re-arraigned on the charge and pled not guilty. The defendant filed a motion to quash the obstruction of justice charge, which was granted by the trial court. On January 25, 2012, after a two day jury trial, the defendant was found guilty of manslaughter. On February 1, 2012, the trial court sentenced the defendant to serve forty years at hard labor, with credit for time served.
| .STATEMENT OF FACT
On March 24, 2011, at approximately 11:00 a.m., the victim, Toriano “Tito” Li-vas, visited Eddie St. Cyr’s Auto Shop *773 located at 2135 South Derbigny Street, to collect a payment he was owed for the rental of auto shop machinery from his auto shop that he had recently closed due to medical issues. At around the same time, the defendant, Durrelle Bowens, his girlfriend, Lashanda Watson, his brother, Chad Bowens and his girlfriend Jonece Duncan, along with their one year old son, C.B., arrived at St. Cyr’s Auto Shop, to check on their mother’s truck, which was being painted.
As Livas was leaving the shop, a verbal dispute ensued between him, the defendant and the defendant’s brother Chad Bowens, which quickly escalated into a physical altercation. Ultimately, a gun battle erupted between Livas and the defendant. When both men ran out of ammunition, Livas attempted to run away, but the defendant reloaded his gun and shot Livas in the back of his leg. Livas attempted to get away but the defendant shot him again. As Livas was lying on the ground pleading for his life, the defendant again shot him several more times in the head and torso fatally wounding Livas.[1] The defendant then fled in a black Acura MDX SUV with his girlfriend Lashanda Watson driving the vehicle.[2] The vehicle was abandoned in the 2100 block of Clara Street. Before abandoning the vehicle, lathe registration documents and temporary license plate were removed from the vehicle. The defendant then fled to Texas where he was ultimately apprehended.
ERRORS PATENT
A review for patent errors reveals none.
DISCUSSION
COUNSEL’S ASSIGNMENT OF ERROR NUMBER 1
The defendant argues that the State failed to prove sufficient evidence to sustain his conviction for manslaughter as the State failed to carry its burden to prove that the defendant did not act in self-defense. In the present case, the defendant was charged with second degree murder, but convicted of manslaughter. However, the defendant argues that the State failed to produce sufficient evidence to show that he did not act in self-defense. The defendant contends that the trial testimony shows that he shot at the defendant only to protect himself.
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Hearold, 603 So.2d 731, 734 (La.1992). When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court “must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.” State v. Neal, 2000-0674 (La.6/29/01) 796 So.2d 649, 657 *774 (citing State v. Captville, 448 So.2d 676, 678 (La.1984)).
|4When circumstantial evidence is used to prove the commission of the offense, La. R.S., 15:438 requires that “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” Neal, 796 So.2d at 657. Ultimately, all evidence, both direct and circumstantial must be sufficient under Jackson to prove guilt beyond a reasonable doubt to a rational jury. Id. (citing State v. Rosiere, 488 So.2d 965, 968 (La.1986)). See also State v. Brown, 2003-0897 (La.4/12/05), 907 So.2d 1.
Conflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency. When testimony is conflicting, the credibility of the witnesses is a determination which is within the sound discretion of the trial court. Like all questions of fact, this determination is entitled to great weight and will not be disturbed unless clearly contrary to the evidence. State v. Vessell, 450 So.2d 938, 943 (La.1984); State v. Marshall, 2004-3139, p. 9 (La.11/29/06), 943 So.2d 362, 369. It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence. Even where the record contains evidence conflicting with the testimony accepted by the trier of fact, the evidence accepted by the trier of fact is not rendered insufficient. State v. Jones, 537 So.2d 1244, 1249 (La.App. 4 Cir.1989). Absent internal contradiction or irreconcilable conflict with the physical evidence, a single witness’s testimony, if believed by the fact finder, is sufficient to support a factual conclusion. State v. Legrand, 02-1462, p. 5, 864 So.2d 89, 94-95 (La.12/3/03).
Manslaughter is a homicide which would be first or second degree murder, but the offense is committed in “sudden passion” or “heat of blood” imme-
diately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31. “Sudden passion” and “heat of blood” are not | ^elements of the offense of manslaughter; rather, they are mitigatory factors, in the nature of a defense, which diminish the degree of culpability and reduce the grade of the offense from murder to manslaughter. State v. Lombard, 486 So.2d 106, 110-111 (La.1986). Since they are mitigating factors, the defendant has the burden of proving by a preponderance of the evidence that he acted in “sudden passion” or “heat of blood” before he is entitled to a manslaughter verdict. In reviewing a claim that the defendant acted in “sudden passion” or “heat of blood,” the court must determine whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that those mitigating factors were not established by a preponderance of the evidence by the defendant. Id.
A homicide is justifiable “[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.” La. R.S. 14:20(A)(1). In a homicide case in which the defendant asserts he acted in self-defense, the State has the burden of establishing beyond a reasonable doubt that the defendant did not act in self-defense. State v. Taylor, 2003-1834, p. 7 (La.5/25/04), 875 So.2d 58, 63; State v. Kirk, 2011-1218, pp. 6-7, (La.App. 4 Cir. 8/8/12), 98 So.3d 934, 939-940.
The question presented is whether the defendant acted without justification. Accordingly, the relevant inquiry is whether a rational factfinder, after viewing the evidence in the light most favorable to the prosecution, could have found beyond a *775 reasonable doubt that the defendant did not act in self-defense. State v. Rosiere, 488 So.2d 965 (La.1986).
Even if both necessary components are present, that is not sufficient for the justification of self-defense because not every person is entitled to claim the 1 fidefense. In particular, and importantly for the prosecution’s contention, “[a] person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw or discontinue the conflict.” La. R.S. 14:21.[3] Thus, a person who has brought on the difficulty not only must withdraw from the conflict but the withdrawal must be in such a way that the other person “knows or should know” of the desire to withdraw. If the aggressor’s withdrawal is not made sufficiently known to his adversary, he is not eligible to claim the justification of self-defense for the homicide. This precedent obligation of the one who brings about the difficulty to “withdraw” may be contrasted with the absence of an obligation of “[a] person who is not engaged in unlawful activity and who is in a place where he or she has a right to be.” La. R.S. 14:20(C). Such a person “shall have no duty to retreat before using deadly force as provided for in this Section.” Id. Even more so; such a person “may stand his or her ground and meet force with force.” Id.
In State v. Ducksworth, 496 So.2d 624 (La.App. 4 Cir.1986), this Court found that the State met its burden of proving that the defendant did not act in self-defense. The Court noted that there was testimony that the victim was unarmed and attempted to flee when the defendant started shooting at him. The Court stated that “such conduct negated justification for the continued use of deadly force, if 17any ever did exist ... The law will not permit even a harassed individual to take the law into his own hands, track down his enemy, assault him with a pistol, and then claim justification for a homicide which follows because of prior threats.” Ducksworth, 496 So.2d at 630.
In State v. Wells, 2011-0744 (La.App. 4 Cir. 7/11/14), 156 So.3d 150, 2014 WL 3398136, this Court found that the defendant had not acted in self-defense when he shot and killed the victim. The defendant did not dispute that he shot the victim. He argued at trial and on appeal that he acted in self-defense. The State was able to produce sufficient evidence for the jury to conclude beyond a reasonable doubt that the defendant did not act in self-defense.
During the course of trial, Kisyhyne Li-vas, the victim’s wife, testified that she and the victim had been married for over ten years. They owned an auto body repair shop, but had to close it because the victim had taken ill. Mrs. Livas stated that the victim and St. Cyr had a business relationship, and that St. Cyr had rented some equipment from them. On the morning of March 24, 2011, she picked up her grandchild, went home and fixed breakfast for her husband and her grandchild. Her husband informed her that the baby had a fever and that he was going to purchase Tylenol for the child. He called St. Cyr to see about picking up the money owed to him while he was out. St. Cyr told him to *776 come by and get the money. The victim then left the house to pick up the money from St. Cyr and get Tylenol for their grandchild. The victim called her before he got to St. Cyr’s body shop.
Mrs. Livas testified that a few months prior, her husband had surgery and had part of his colon removed. He was still recovering from the surgery when he was killed. Mrs. Livas stated that she worked with her husband in the auto body | Rrepair shop. She took care of the customers and handled ordering and paying for supplies. Because she handled a great deal of cash and several of the businesses in the area had been robbed, she purchased a nine millimeter gun for protection. Mrs. Livas stated that her husband did not approve of the purchase. She kept the gun in her purse or the car. On March 24, 2011, she had left the gun in the vehicle. Mrs. Livas identified the receipt for the weapon and the ammunition she purchased.
Mrs. Livas recognized the defendant in court as someone who had been to their auto repair shop. On one occasion, the defendant came to the shop when the guys were at lunch and her husband had run an errand. She was the only person at the shop. The defendant asked her in a nasty way about his vehicle. Mrs. Livas called her husband and told him to return to the shop because they had a customer. When Livas returned, he spoke with the defendant, who was upset that his vehicle was not ready. The defendant threatened to bust the parts in the shop and the windows in the other customers’ vehicles. Livas asked the defendant to leave. The defendant grabbed a stick and went to swing it. However, Livas grabbed the stick and the defendant left.
Eddie St. Cyr testified that he owned an auto repair business at the intersection of South Derbigny and Josephine Streets in March 2011. St. Cyr stated that he did business with the victim, Toriano Livas. He had purchased some machinery from Livas, who also had an auto repair business. Around noon on March 24, 2011, Livas came to his shop to pick up a payment for the machinery. At that time, Chad Baxter was also at the shop. Baxter had brought someone to look at a vehicle that he was working on. When Livas arrived, St. Cyr and Livas went into the office, and St. Cyr gave Livas the money for the machinery. Livas then left the shop. A few minutes later, St. Cyr heard Livas yelling for him. He |3went outside and saw two men fighting with Livas. Li-vas told St. Cyr to tell them to get off of him. St. Cyr saw that the two men had Livas on the ground. One of the men had Livas in a headlock, and the other man was hitting Livas. The man holding Livas down had a short bush haircut. The man hitting Livas had dreadlocks.
St. Cyr, who was holding a pipe, and Chad Baxter, who had a screwdriver, approached the men. The guy with the dreadlocks pulled a gun and told them, “I don’t have no problem with you, Unc.” St. Cyr responded by telling the guy that Livas had been sick and he was not going to let them jump Livas. The guy told St. Cyr that Livas had messed over his brother, and he was going to get even. The guy with the short bush backed off, and Livas was able to get free and run towards his vehicle. St. Cyr was still talking to the guy with the gun. All of sudden, the guy with the gun and Livas started shooting at each other. They both ran to the corner shooting at each other, from behind barrels. Both guns went empty. Livas attempted to run away. The guy with the dreadlocks reloaded his gun and continued shooting at Livas. Livas fell down in the street and dropped his gun. The guy walked up to Livas, who was pleading for his life, and shot Livas several more times. *777 After the guy shot Livas, he walked back to the black SUV that was parked in the middle of the street, near the corner, and drove off. St. Cyr called 911 to report the shooting. St. Cyr stated that he dropped the pipe when the shooting began and ran for cover. The witness gave a statement to the police and indicated that he would be able to identify the two men. St. Cyr stated that he did not know the men personally, but knew that the guy with the weapon had purchased a vehicle from someone he knew. St. Cyr testified at trial that he | inidentified the defendant in a photographic lineup. He also identified the defendant at trial as the person who shot Livas.
Chad Baxter testified that he was an acquaintance of the victim, Toriano Livas. Baxter stated that on March 24, 2011, he was at St. Cyr’s Body Shop when Livas came by to pick up money from St. Cyr. Baxter testified that he spoke with Livas after Livas left St. Cyr’s office and began walking to his car. Baxter stated that he saw a vehicle approach the shop and stop at the corner. The driver rolled down his window and spoke to Livas. There were two men and one woman in the vehicle. The two men got out of the vehicle; one had short hair and the other had dreadlocks. The taller guy with the short haircut and Livas were talking. Moments later, he looked backed and saw the two men fighting with Livas. Livas yelled for help and asked the men why they were fighting with him. When Baxter and St. Cyr approached, the man with the short hair backed off and let Livas go. The man with the dreadlocks walked towards Livas. The man with the short hair then said “We are even — I’m good.” The man with the dreadlocks pulled out a gun and said “No, bitch. We are not even.” Livas walked to his car, where he sat with his hand on his head; he was bleeding from his head. The witness then heard gunshots and felt something hit his leg. Baxter ran towards his vehicle. He saw Livas run towards the corner of Josephine Street. Livas and the man with the dreadlocks were exchanging gunfire. Baxter saw Livas fall. The man with the dreadlocks approached Livas, stood over him and shot him. The other guy, with the short haircut, had run around the corner when the shooting started. The woman in the vehicle got out of the passenger side, got in the driver’s seat and drove off in the direction that the man with the short hair had run. The police arrived moments later. Baxter testified that he left the scene briefly and returned. He spoke with the In police and gave a recorded statement. Baxter identified both men in photographic lineups. He identified the defendant at trial as the person who shot Livas.
Mallory Gonzales testified that on March 24, 2011, she was working at the New Orleans College Prep Charter School. She stated that she was on the third floor and could see the intersection of Josephine and South Derbigny Streets from her classroom window. She heard noises that sounded like fire crackers. When she looked outside, she saw a man behind a blue barrel and another man shooting towards the barrel. The man who was shooting went to a car, got in the back seat and then came back out. The man behind the barrel started to flee. The man who got out the car repeatedly shot towards the other man. It appeared that the man who was behind the barrel had been shot in the leg because he was hopping on one foot. The other man continued shooting at the man from behind the barrel until he fell down. The man continued to shoot him, and then left. Ms. Gonzales stated that she called 911. She did not see the victim with a gun.
Ms. Shvonne Lewis is a complaint operator with the New Orleans Police Depart *778 ment Communications Division. She handles 911 calls and is the custodian of the incident recall documents and 911 recordings. Ms. Lewis identified the incident recall sheet and recording of the 911 call received in regards to the shooting. The 911 recording was played for the jury.[4]
On March 24, 1011, Detective Kevin Marshall and his partner, Officer Raymond Lester, were on patrol in the Sixth District, when they responded to the dispatch call of a homicide by shooting. When they arrived on the scene, the officers observed a man lying in the middle of the street. His body had sustained | ^numerous gunshot wounds. There were shell casings all over the place. A gun was found next to the man, partially tucked underneath him. The officers secured the scene and notified the homicide division and the coroner’s office. Detective Anthony Pardo, of the Homicide Division, arrived at the scene later and took over the investigation.
Dr. Samantha Huber, a forensic pathologist with the Orleans Parish Coroner’s office, performed the autopsy on the victim, Toriano Livas. Dr. Huber testified that the victim sustained eight gunshot wounds. One wound was to the forearm. Another gunshot entered the side of the arm and hit the lung. There was a gunshot wound to the back of the knee. The bullet fractured the tibia. One bullet struck ■ the victim’s side, hitting the left kidney, liver, pancreas and diaphragm and resulting in blood in the lungs and abdomen. Another bullet struck the victim’s right hip and lodged in the back of the pelvis. There were three gunshot wounds to the head. One bullet struck the left check. Another bullet caused a graze wound on the underside of the chin. The third bullet wound was to the skull, which resulted in near immediate death. The victim also had a number of bruises and abrasions. Dr. Huber identified the bullets that she recovered from the victim’s body during the autopsy. She testified that the gunshot wound to the knee that fractured the tibia would prevent someone from running at full speed. Dr. Huber stated that the gunshot wound to the skull was the most serious but a combination of all the wounds would cause death.
Shandrell Privott, a technician with the NOPD’s crime lab, processed the crime scene at South Derbigny and Josephine Streets. Ms. Privott stated that she collected evidence and took photographs of the scene. She identified photographs of the scene and the evidence collected at the scene. A nine millimeter Taurus was 11sfound under the victim. Six nine-millimeter Lugar spent shell casings and seventeen forty-caliber spent casings were found on the scene.[5] A black magazine for a nine millimeter weapon and a black magazine for a forty-caliber weapon were also found on the scene. Ms. Privott also identified photographs that she took at the scene on Claire Street, where the vehicle was found.
Detective Anthony Pardo, a member of the NOPD’s Homicide Division, was assigned as the lead investigator in the murder of Toriano Livas. When he arrived on the scene, he met with Lt. Jeffrey Wall of the Sixth District Investigative Unit. The officer was made aware of the witnesses, who he had transported to the homicide *779 office at the police headquarters for statements. Detective Pardo observed numerous shell casings on the scene. He stated that the crime lab collected all the evidence. There were six spent nine millimeter shell casings and seventeen forty caliber spent shell casings on the scene. An empty forty caliber magazine was found on the scene, but no forty caliber weapon was recovered. Two eyewitnesses, Chad Baxter and Eddie St. Cyr, were cooperative. They provided statements and descriptions of the perpetrators.
On the same day of the shooting, Detective Pardo became aware of an abandoned vehicle, a black Acura MDX SUV, that may have been used in the homicide. The vehicle was located four blocks from the scene of the shooting. The vehicle was secured and impounded. A search warrant for the vehicle was obtained, and the vehicle was subsequently searched. There was no license plate on the vehicle. No ownership information was found in the vehicle. | ^Correspondence addressed to the defendant was found in between the console and the front passenger seat. A business card from Covington Conceal-ments and a piece of cardboard with the phone number and address for Covington Concealments was found in the vehicle. A dreadlock was also found in the vehicle. Fingerprints were lifted from the vehicle.
Detective Pardo became aware of a potential suspect through a telephone call received by an Eighth District police officer. At some point, the defendant and his brother, Chad Bowens, became suspects. Photographs of both men were placed in photographic lineups. Baxter and St. Cyr identified both men in the photographic lineups. An arrest warrant was issued for the defendant and Lashanda Watson. Watson was arrested, but the defendant could not be found. Eventually, the defendant was located in Texas and arrested. He was subsequently extradited to New Orleans. When the defendant was extradited, he no longer had dreadlocks.
Craig Famularo, an Assistant District Attorney with Orleans Parish District Attorney’s office, testified that he reviews homicide cases for charging. He makes recommendations as to what charges should be filed against a person. As part of the process, he interviews witnesses to the crimes. In the present matter, he interviewed St. Cyr. Part of the summary of the interview with St. Cyr indicated that the victim fired his weapon first. However, his recommendation was to charge the defendant with second degree murder because the defendant was the aggressor. The defendant had attacked the victim, beat him and pulled out a weapon first. He noted that the defendant never retreated.
Jonece Duncan, Chad Bowens’ girlfriend, testified that she was with Chad Bowens, the defendant, and the defendant’s girlfriend, Lashanda Watson, on | lsMarch 24, 2011. She also had her and Chad’s two-year old son with them. They were driving around in the defendant’s car. The defendant was going to check on a vehicle at a body shop. Everyone stayed in the car when the defendant got out and went to talk to the man at the body shop. All of a sudden, she saw a fight break out between the defendant and . a man. Chad got out' of the car and joined the fight. She got out of the vehicle to break up the fight. As they were walking back to the car, she saw the other man walk to his car. When he opened his door, she saw he had a gun and was pointing it at them. Chad ran across the street. She heard glass breaking and reached into the car to get her son. She then ran into a store on the side street and asked someone with the store to call 911. The defendant, who had a gun, started shooting at the other man. *780 After a few minutes, the defendant, Chad and Lashanda drove around the block and picked up her and her son from the store. They then left the area. She did not see the license plate taken off the vehicle or the vehicle documentation taken out of the vehicle. She testified that the defendant did not tell her to come to court and say that she and her child were in the vehicle.
Durrelle Bowens acknowledged that he had taken his vehicles to the victim’s auto repair shop. On March 24, 2011, he went to St. Cyr’s body shop to check on his mother’s vehicle. Lashanda, Jonece, Chad and Chad’s son were.in the car with him. When he arrived at the shop, he got out the car and went to talk to James about the car. As he walked to the shop, he was stopped by the victim who told him something. They started arguing and then fighting. The defendant’s brother, Chad, joined in the fight. The victim attempted to run towards his car. He opened the door and appeared to be reaching for something. The defendant pulled the victim away from the car, and they continued fighting. During the fight, the victim pulled the defendant’s dreadlocks. The victim was yelling for someone to come 11fihelp him. The defendant looked up and saw two men with weapons — one with a pipe and another with a screwdriver — approaching him. He showed them his gun to let them know that it was just a fight. He told them, “It’s a fight, we don’t need weapons.” The defendant and his brother then let the victim go. They walked back to their vehicle. Chad got in the backseat, and the defendant in the driver’s seat. As he got in the car, he heard the back window shatter. Jonece screamed. He looked at the back of the car and saw the victim pointing a gun at them. He saw the gun discharge in the direction of the car. The defendant ran to the back of the car and started shooting at the victim. The victim got behind a barrel and continued shooting at him. The defendant returned to his car and changed the magazine in his gun. He turned around and saw the victim running towards him. He shot the victim, and the victim fell to the ground. As the defendant ran towards his car, he saw the victim reaching for his weapon. Thinking that the victim was going to shoot him, he shot the victim again. The defendant stated that he had a concealed carry permit for his weapon. He did not know he hit the victim until the victim fell and the shooting stopped. The defendant contended that the victim had his gun in his right hand while the victim was on the ground. The defendant stated that the victim was moving and trying to shoot him.
The defendant returned to his vehicle. Lashanda also got in the car, and they drove off. They picked up Chad on Martin Luther King Boulevard. They picked up Jonece and her son at a service station on the corner of Claiborne Avenue and Martin Luther King. The defendant then parked the vehicle in an alley. They got rid of the vehicle because they did not want to get hurt by the shattered glass from the back window. The license plate, which was a paper plate, fell when the window was shattered. The defendant stated that he went to Texas to have some |17fun before he went to jail. He intended to turn himself in when he returned to Louisiana. He does not recall a jail house phone call in which he told someone to tell Jonece to bring all her children to court with her and say that they were all in the car with them.
On rebuttal, Don Hancock, the telephone supervisor at the Orleans Parish Sheriffs Office, testified that he oversees the telecommunications system at Orleans Parish Prison. He stated that all inmate calls are recorded. He identified the call detail and recordings of the phone calls *781 made by the defendant. The recordings were played for the jury.
Detective James O’Hearn, a NOPD officer assigned to the District Attorney’s office, testified that he performed a concealed carry permit check. There was nothing in the records to suggest that the defendant had a concealed carry permit.
In the present case, the testimony presented at trial was sufficient for the State to prove, beyond a reasonable doubt, that the defendant did not act in self-defense. The eyewitness testimony reveals that al- • though the victim and the defendant were engaged in a shoot-out initially, the victim was attempting to retreat to his vehicle when the defendant reloaded his weapon and continued to shoot at the victim. The defendant shot the victim in the leg, causing the victim to fall. While the victim was on the ground, unarmed and pleading for his life, the defendant walked up to the victim and continued to shoot him. The testimony also reveals that the defendant and his brother instigated the initial fight when they got out of their vehicle and started beating the victim. The testimony from St. Cyr and Baxter indicate that the defendant and his brother would have continued beating the victim had they not intervened.
| isThis assignment is without merit.
COUNSEL’S ASSIGNMENT OF ERROR NUMBER 2
The defendant also argues that the trial court imposed an unconstitutionally excessive sentence. The defendant contends that there was no basis to support a maximum sentence of forty years at hard labor.
In State v. Smith, 2001-2574, pp. 6-7 (La.1/14/03), 889 So.2d 1, 4, the Louisiana Supreme Court set forth the following standards for reviewing a claim of excessive sentence:
Although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness. A sentence is unconstitutionally excessive when it imposes punishment grossly disproportionate to the severity of the offense or constitutes nothing more than needless infliction of pain and suffering. A trial judge has broad discretion when imposing a sentence and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. On appellate review of a sentence, the relevant question is not whether another sentence might have been more appropriate but whether the trial court abused its broad sentencing discretion, (citations omitted)
In reviewing a claim that a sentence is excessive, an appellate court generally must determine whether the trial judge has adequately complied with statutory guidelines in La.C.Cr.P. art. 894.1 and whether the sentence is warranted under the facts established by the record. If adequate compliance with Article 894.1 is found, the reviewing court must determine whether the sentence the district court imposed is too severe in light of the particular defendant as well as the particular circumstances of the case, “keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged.” State v. Landry, 2003-1671, p. 8 (La.App. 4 Cir. 3/31/04), 871 So.2d 1235, 1239; see also State v. Bonicard, 98-0665, 3 (La.App. 4 Cir. 8/4/99), 752 So.2d 184, 185.
|inHowever, in State v. Major, 96-1214, p. 10 (La.App. 4 Cir. 3/4/98), 708 So.2d 813, 819, this Court stated:
The articulation of the factual basis for a sentence is the goal of Art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the *782 sentence imposed, resentencing is unnecessary even when there has not been full compliance with Art. 894.1. State v. Landos, 419 So.2d 475 (La.1982). The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La. C.Cr.P. art. 881.4(D).
The trial judge is given a wide discretion in the imposition of sentences within statutory limits, and the sentence imposed by him should not be set aside as excessive in the absence of a manifest abuse of his discretion. State v. Howard, 414 So.2d 1210, 1217 (La.1982); State v. Ambeau, 2008-1191, p. 10 (La.App. 4 Cir. 2/11/09), 6 So.3d 215, 222.
This Court has upheld forty-year sentences for manslaughter in the past. See State v. Allen, 2006-1434 (La.App. 4 Cir. 3/7/07), 954 So.2d 779 (the defendant, who had prior convictions, stabbed someone whom he thought had stolen his wallet); State v. Bell, 2002-2349 (La.App. 4 Cir. 8/6/03), 854 So.2d 429 (the defendant, who had no prior convictions, stabbed her lover; she had been charged with second degree murder); State v. Jones, 2001-0630 (La.App. 4 Cir. 3/20/02), 814 So.2d 623 (the defendant, charged with second degree murder, was convicted of manslaughter in the shooting death of a man with whom he had fought earlier the same night); State v. Williams, 99-2355 (La.App. 4 Cir. 12/13/00), 776 So.2d 604 (the defendant, charged with first degree murder, was convicted of manslaughter when he opened fire in the apartment of a man with whom he had previously fought).
In State v. Colbert, 2007-0947 (La.App. 4 Cir. 7/23/08), 990 So.2d 76, the defendant had been charged with second degree murder, found guilty of | ^manslaughter and attempted second degree kidnapping. He was sentenced to serve forty years at hard labor, the statutory maximum. This Court affirmed the sentence imposed, noting that the victim was not armed and in no way provoked the defendant. The Court recognized that the defendant was initially charged with second degree murder. The trial testimony revealed that the defendant was lying in wait with a gun when his ex-girlfriend and the victim arrived on the scene.
In State v. Peters, 2012-1641 (La.App. 4 Cir. 8/21/13), 123 So.3d 307, the defendant was convicted of being involved in a drive-by shooting in which the shooters repeatedly fired semi-automatic weapons at a paraplegic man in a wheelchair, striking him fourteen times. The trial court imposed a forty year sentence, noting that the defendant had been charged with second degree murder but found guilty of manslaughter. This Court found that the trial court did not abuse its discretion when it imposed the maximum sentence.
In the case at bar, the defendant was initially charged with second degree murder, but the jury found him guilty of manslaughter. At the sentencing hearing, the trial court heard victim impact testimony from the victim’s wife. The defendant stated he was sorry it happened, but continued to argue that it was self-defense. The trial court, in imposing the maximum sentence, recognized that the defendant shot at the victim seventeen times and struck him eight times. The trial court noted that the defendant shot the victim while the victim was on the ground. The trial court found that the evidence showed that the defendant was the aggressor and did not stop. The court stated:
Your actions, not only on the day of that crime, but in this Court as you testified, show a lack of remorse. Your absence of feeling in taking another person’s life, and your failure to take responsibility. Even your comments today of you’re “sorry it happened” is not *783 taken by this Court as |g1an acceptance of responsibility, more as a, you’re sorry for what’s a happening to you.
The jury found that your crime was not justified by self-defense. They didn’t find you guilty of the maximum charge. They did find you guilty of the lesser charge. And I think indeed you were shown mercy by the jury.
The fact that Mr. Livas did shoot a gun is probably what managed to give the jury the opportunity to find you guilty of Manslaughter. I find that Mr. Livas was protecting himself, in as much as you and your brother had physically attacked him, and that attack was not waning, it was continuing and proceeding. The fact that he got a gun to defend himself, and then you pulled your gun, and the fact that you represented to the Court that you had a gun license and it was not appropriately or further proven, I find that that was not the truth either.
The trial court more than sufficiently complied with the requirements of La. C.Cr.P. article 894.1 in setting forth the reasons for the sentence imposed. Further, the trial court’s reasons and analysis of the facts of the case presented at trial clearly support the sentence of forty years at hard labor. As the trial court noted, the defendant shot at the victim seventeen times and continued to shoot the victim while the victim was on the ground. The defendant showed no remorse for his actions and continued to argue that he acted in self-defense. The trial court did not abuse its discretion in sentencing the defendant to serve forty years at hard labor.
This assignment of error is without merit.
PRO SE ASSIGNMENT OF ERROR NUMBER 1
In his first pro se assignment of error, the defendant complains Assistant District Attorney Craig Famularo should not have been allowed to testify because he could not testify as to what occurred during the grand jury proceedings. It should be noted that Mr. Famularo was called as a defense witness. A review of the trial transcript reveals that Mr. Famularo did not testify about the grand jury proceedings. He only testified as to his interview of Eddie St. Cyr. This assignment is without merit.
IttJPRO SE ASSIGNMENT OF ERROR NUMBER 2
In this assignment, the defendant complains that the trial court should not have admitted the testimony of Craig Fa-mularo because it was hearsay. As stated above, Mr. Famularo was called as a witness by defense counsel and questioned about a prior statement made by Eddie St. Cyr during St. Cyr’s interview with Famu-laro. As such, defendant made no objection to the testimony. Further, there were no hearsay objections made during the State’s cross-examination of Famularo. Thus, appellate review of any alleged hearsay error is precluded. La.C.Cr.P. article 841. This assignment of error is without merit.
PRO SE ASSIGNMENT OF ERROR NUMBER 3
In his third pro se assignment, the defendant contends that the prosecutor made improper remarks that defendant’s witnesses, Chad Bowens, Lashanda Watson, and Jonece Duncan should have independent counsel prior to testifying at the trial. The defendant argues that these remarks intimidated the witnesses and caused them to decline to testify at trial. The defendant’s argument is completely without merit. All three witnesses were placed at the crime scene. Watson was named as a co-defendant in the original indictment. *784 The testimony of Eddie St. Cyr and Chad Baxter reveals that Chad Bowens participated in the physical attack on the victim and could have been charged as a result of that attack. Additionally, both Bowens and Duncan could have been charged with either obstruction of justice or accessary after the fact. The trial transcript reveals that the trial judge extensively spoke with these witnesses about their need for counsel prior to determining whether they should testify at trial. After conferring with counsel, Watson and Duncan indicated that they would invoke their Fifth Amendment rights if called to testify. Jo-nece Duncan decided to testify, and did testify, at trial.
IgjjThis assignment is without merit.
PRO SE ASSIGNMENT OF ERROR NUMBER 4
In this assignment, the defendant argues that the trial court failed to properly instruct the jury on the aggressor doctrine. A review of the trial transcript reveals that the only objection made concerning the jury instructions was concerning the “majority verdict of the State of Louisiana that’s allowed under [the] law.” The defendant’s failure to object precludes appellate review. La.C.Cr.P. article 841. This assignment of error is without merit.
PRO SE ASSIGNMENT OF ERROR NUMBER 5
The defendant argues in this assignment of error that the appellate record is incomplete, which prejudices the defendant from having a guarantee of a complete appeal. The portions of the record which defendant claims should have been included in the appeal record are (1) examination of the prospective jurors; (2) the prosecutor’s statement on the aggressor doctrine; (3) orders for the prosecution to produce the statements of Eddie St. Cyr, Chad Baxter and Lashanda Watson; (4) transcribed jail calls; and (5) 911 recordings. The defendant also claims that names are misplaced and the wording is changed in some portions of the record.
A review of the appellate record reveals that the portion of the voir dire during which objections were made was transcribed and made a part of the appeal record. The prosecutor’s reference to the aggressor doctrine in his opening statement was not objected to by defense counsel and referred to statements that were apparently made during voir dire on January 23, 2012. Because there were no objections by defense counsel, review of any alleged errors is precluded under La. C.Cr.P. article 841.
^The defendant also asserts that the trial court ordered the prosecution to turn over to the defendant statements made by the witnesses to Detective Pardo, but the order is missing from the appellate record. A review of the appeal record reveals that the defendant requested the information as part of his discovery requests and that the State provided the defendant with the information. The defendant also contends that the appellate record should have included the 911 calls and transcriptions of the jail calls. However, defense counsel objected to the 911 call, noting that it had no testimonial value. In regards to the jail calls, there was no request made by defense counsel that the calls be transcribed. Defense counsel was provided with copies of the audiotapes of the phone calls, and the audiotapes are part of the appellate record.
The defendant also contends that names are misplaced and the wording is changed in some portions of the record. However, he does not assert any specific errors in the record.
The defendant’s argument that the appellate record is incomplete is without merit.
*785 PRO SE ASSIGNMENT OF ERROR NUMBER 6
The defendant also suggests that the State withheld exculpatory evidence. He alleges that the State failed to provide (1) information concerning St. Cyr’s statement that the victim shot first; (2) the CD containing the jail calls to the defendant prior to trial; and (3) witnesses’ rap sheets. A review of the record reveals that the defendant was provided with the witnesses’ rap sheets and the information about St. Cyr’s statement prior to trial. The appellate record indicates that the defendant was provided with the CD during the trial. However, it should be noted that the CD was not used by the State until rebuttal, after the defendant |2Btestified on his own behalf and denied making certain statements during the phone calls. Further, review of the CD reveals that it did not contain any exculpatory evidence.
This assignment of error is without merit.
PRO SE ASSIGNMENT OF ERROR NUMBER 7
In his last pro se assignment, the defendant contends that the cumulative errors prevented him from receiving a fair trial. However, as noted above, the defendant’s pro se assignments of error have no merit. The State produced sufficient evidence to prove, beyond a reasonable doubt, that the defendant did not act in self-defense. In light of the circumstances in the present case, the trial court did not abuse its discretion in sentencing the defendant to serve forty years at hard labor.
CONCLUSION
Accordingly, we affirm the defendant’s conviction and sentence.
AFFIRMED.

. Mr. Livas was shot eight times; once in the arm, twice in the torso, once in the back of the knee, once in the hip, and three times in the head. Additionally, he sustained abrasions to his knees, left elbow and forearms, as well as a contusion to his forehead.

. Lashanda Watson was also named as a defendant in the indictment as to count two, obstruction of justice. On February 6, 2012, the indictment was amended to charge her with accessory after the fact. She pled guilty to the amended indictment and was sentenced to five years at hard labor. The sentence was suspended and she was placed on five years active probation.

. La. R.S. 14:21 sets forth the aggressor doctrine:
A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.

. The recording of the 911 phone call was not included in the exhibits that were sent to this Court as part of the appeal record.

. It was stipulated that if Meredith Acosta, of the NOPD Crime Lab, would testify, she would state that all seventeen rounds of forty caliber ammunition were fired from the same weapon and that all six nine millimeter casings came from the same weapon.