| STATE OF LOUISIANA | * | NO. 2024-KA-0240 |
| --- | --- | --- |
| VERSUS | * | COURT OF APPEAL |
| J'KARI CAMPBELL | * | FOURTH CIRCUIT |
| | * | STATE OF LOUISIANA |

\* \* \* \* \* \* \*

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 557-317, SECTION "D"
Judge Kimya M. Holmes
\* \* \* \* \* \*
**Judge Karen K. Herman**
\* \* \* \* \* \*
(Court composed of Judge Daniel L. Dysart, Judge Dale N. Atkins, Judge Karen K. Herman)


Jason R. Williams
DISTRICT ATTORNEY
Brad Scott
CHIEF OF APPEALS
Peter Vesich
ASSISTANT DISTRICT ATTORNEY
619 South White Street
New Orleans, LA 70119

      COUNSEL FOR THE STATE OF LOUISIANA/APPELLEE


Sherry Watters
LOUISIANA APPELLATE PROJECT
P. O. Box 58769
New Orleans, LA 70158


      COUNSEL FOR DEFENDANT/APPELLANT


                     **AFFIRMED**
               **FEBRUARY 5, 2025**

**KKH**
**DLD**
**DNA**

Defendant, J'Kari Campbell ("Defendant"), appeals his conviction and sentence for second degree murder. For the following reasons, we affirm.

**STATEMENT OF CASE**

On March 9, 2023, Defendant was charged by grand jury indictment with committing the second degree murder of Keyron Travis on November 26, 2022, in violation of La. R.S. 14:30.1. On March 23, 2023, Defendant pled not guilty to the charge.

Trial commenced on December 4, 2023 with voir dire proceedings. On December 7, 2023, the jury found Defendant guilty as charged of second degree murder.

On January 18, 2024, a hearing was conducted at which time the trial court denied Defendant's motion for post-verdict modification to guilty of manslaughter; denied Defendant's motion for new trial and request for an evidentiary hearing; granted Defendant's motion to file an affidavit under seal; and denied Defendant's motion for a downward departure from the mandatory minimum sentence established under La. R.S. 15:574.4(F)(1).

1

After defense counsel "waive[d] delays as to sentencing," the trial court imposed a sentence of life imprisonment at hard labor with the possibility of parole after twenty-five years, with credit for time served.

On February 5, 2024, the trial court denied defendant's motion to reconsider his sentence. On that same date, the trial court granted defendant's motion for appeal. Defendant's timely appeal followed.

## STATEMENT OF FACTS

**Matthew Patin**

Matthew Patin ("Mr. Patin") testified that he was "the Chief of Operations for the city's Real Time Crime Center." He explained that the Real Time Crime Center is a city agency which monitors a network of cameras around the city and reports information to pertinent city entities, such as the police and fire departments. Mr. Patin stated that his agency possessed videos pertinent to the case at hand. On cross-examination, Mr. Patin confirmed that the videos commence at approximately 8:40 p.m. because that was the time that police officers were interested in viewing. He further confirmed that any footage depicting what transpired before that time was not requested and, as such, was not preserved.

**Officer Cody O'Dell**

Officer Cody O'Dell ("Off. O'Dell") of the New Orleans Police Department ("NOPD") testified that he was on duty on November 26, 2022, which was when the Bayou Classic was taking place in New Orleans. At approximately 8:42 p.m., Off. O'Dell was stationed at the intersection of Bourbon Street and Canal Street. At that time, he, along with approximately six other officers, heard "two shots fired in a close vicinity, … under the overhang in front of the Crown Plaza [Hotel]" located "at the end of the 700 block of Canal Street." At that point, he immediately started searching for

2

suspects, specifically persons carrying concealed weapons. He saw a suspect (Defendant) who looked like he was concealing a firearm. Upon approaching him, Defendant "attempted to stop" and then "fell to the ground." Ultimately, a gun fell from his jacket and hit the ground. Defendant attempted "to get up and run," but Off. O'Dell "grabbed a hold [sic] of him, ended up taking him to the ground … and getting on top of his back." Thereafter, Off. O'Dell secured the handgun and placed Defendant in handcuffs.

Off. O'Dell's body-worn camera footage was introduced into evidence and published to the jury. The camera footage depicted Off. O'Dell apprehending Defendant as he was attempting to flee the scene. Upon being detained, Defendant denied possessing a gun. Off. O'Dell retrieved the gun from the ground and Defendant again denied the gun was his. Defendant was placed in handcuffs and put in the police cruiser. In securing the firearm, Off. O'Dell stated "this b*tch [the gun] is still hot." Off. O'Dell explained in testimony that the warmth of the gun indicated that "it was just fired." Defendant stated several times in the video he did not do anything and that someone had shot at him.

Off. O'Dell testified that after Defendant was placed in the police car, he was taken to Children's Hospital due to his complaint that his head was hurting. Off. O'Dell admitted to using force to take Defendant down to the ground.

**Kimberly Musall**

Ms. Kimberly Musall ("Ms. Musall") testified that she worked for the New Orleans Police Department Crime Lab as a crime scene investigator. She was called to the crime scene, arriving at 9:33 p.m.

Following her investigation of the scene, Ms. Musall issued a report which included a series of photographs of the crime scene, along with photographs of the deceased victim at University Medical Center, which was introduced into evidence and shown to the jury. Ms. Musall testified that she collected two spent casings from the sidewalk in the 700 block of Canal Street. She also swabbed two firearms to collect DNA evidence.

**Officer Edrius Brown**

Officer Edrius Brown ("Off. Brown") of the NOPD testified that on the evening of the shooting, he and his partner were "doing proactive patrols around the CBD [Central Business District]." While on patrol, he received a radio report that "two shots" had been fired on Canal Street and that "an apprehension was made by one of my partners, Cody O'Dell." Upon hearing the report, he and another officer relocated to the area.

Off. Brown activated his body-worn camera and the footage from his camera was introduced into evidence and played for the jury. The camera footage reflected that Off. Brown and his partner reached the victim and the officers and EMS attempted to give aid. Off. Brown stated that they found a firearm on the victim and two wounds – "[t]here was an entry wound and an exit wound in his arm [a]nd an entry wound into the upper torso, left side." Shortly thereafter, an ambulance arrived and transported the victim to receive medical care.

**Dr. Cynthia Gardner**

Dr. Cynthia Gardner ("Dr. Gardner"), an expert in the field of forensic pathology, of the Orleans Parish Coroner's Office, performed an autopsy on the victim, Keyron Travis. Dr. Gardner stated that the victim suffered two gunshot wounds of "[i]ndeterminate range," meaning that the gun was fired "from [a distance] greater than two feet away." One gunshot entered the

victim's left upper arm and exited the inner upper arm. The other gunshot, which did not exit the body, entered on the left side of the victim's torso. This was the gunshot that caused extensive damage to several of the victim's internal organs. The victim's death was classified as a homicide.

**Sergeant Brian Elsensohn**

Sergeant Brian Elsensohn ("Sgt. Elsensohn") testified that on Saturday, November 26, 2022, he was assigned to patrol the intersection of Canal and Bourbon Streets. On that evening, he, along with fellow officers, heard the "sound of gunfire erupt." He and several other officers quickly moved to the area where they heard the shots and he was told by Off. O'Dell that a suspect fleeing from the scene had been apprehended. Off. O'Dell further stated that the suspect possessed a firearm that "was still warm to the touch."

Because force was used during the apprehension of Defendant, Sgt. Elsensohn investigated the matter to ensure it was commensurate. As part of his investigation, Sgt. Elsensohn interviewed Defendant. The interview was recorded on his body-worn camera and the footage was introduced into evidence and played for the jury. In the video, Defendant stated that before he came in contact with Off. O'Dell, he was running but fell and people "trampled" him. Thereafter, when Off. O'Dell apprehended him, he hit his head "on a pole," causing him to suffer a bump on his forehead. Defendant was brought to the hospital where he was given pain medication. Defendant complained that his head hurt where he sustained his injury.

**Sean McElrath**

Sean McElrath ("Mr. McElrath"), an expert in firearm and tool mark examinations, testified that he was the head for the forensic firearm section of the New Orleans Police Department's Crime Lab.

Mr. McElrath tested two fired cartridge cases and a Smith and Wesson firearm. Based on his testing, Mr. McElrath was able to conclude that both "cartridge cases were fired [from] this weapon," i.e., the Smith and Wesson firearm that was recovered from the 700 block of Canal Street.

**Detective Alex Reiter**

Detective Alex Reiter ("Det. Reiter") testified that he had been a detective for approximately four years and it was his duty to investigate violent crimes including homicide investigations, attempted murder investigations, shootings, stabbings, aggravated assaults and armed robberies. At the time of the homicide at issue, Det. Reiter was located at the Eighth District Station in the French Quarter and was notified of the shooting which occurred in the 700 block of Canal Street. Upon receiving notification, he, along with Detective Donald Williard, relocated to the scene of the shooting. When they arrived, Det. Reiter stated that Defendant was still at the scene. Det. Reiter obtained the video footage from the Astor Crown Hotel's three exterior cameras. The hotel cameras' video footage was then introduced into evidence.

**Detective Walter Edmond**

Detective Walter Edmond ("Det. Edmond") testified that he was the lead detective assigned to investigate the homicide of the victim. He was notified that a suspect was in custody and that there was surveillance footage of the shooting which caused the victim's death. The surveillance footage from the three cameras at the Astor Crown Plaza Hotel was then published to the jury. Det. Edmond stated that the "top left" camera footage captured the shooting. The surveillance footage reflected, and Det. Edmond testified, that Defendant entered the picture from the bottom of the footage; he was wearing a black hood over his head with a mask covering the lower portion

6

of his face and he was walking with an individual wearing a cream-colored hooded sweatshirt. Then, Defendant stopped for a few minutes while on the sidewalk near where a truck was parked. Defendant suddenly raised his arm, firing shots, and everyone in the crowded area scattered. Defendant then fled.

After watching the surveillance video and speaking with Off. O'Dell about his apprehension of Defendant, Det. Edmond applied for an arrest warrant for Defendant on the charge of second degree murder. The warrant was subsequently signed by a juvenile court judge.

In connection with Det. Edmond's testimony, a second video, the Real Time Camera footage showing a view of the corner of Canal Street and Bourbon Street was published to the jury. The footage reflected the victim, wearing a black jacket, running across Canal Street and, after crossing the street, collapsing.

Additional Real Time Crime Camera video footage, showing a view of the corner of Canal Street and Carondelet Street was published to the jury. This footage depicted the crowd fleeing from the scene of the shooting and numerous police officers heading toward where the shots were fired.

On cross-examination, Det. Edmond confirmed that he did not speak with any individual who was with the victim on the night he was shot and, therefore, did not know what transpired prior to the shooting. The same was true with respect to Defendant; because Det. Edmond did not question Defendant, he did not know what occurred before the shooting took place.

**J'kari Campbell**

Defendant testified that at the time of the shooting, he was fifteen years old. He had traveled from Baton Rouge to New Orleans to attend the Bayou Classic. He explained that he brought a gun with him because earlier

7

that year, he had been shot following football tryouts. He carried the weapon "for … protection."

Following the game, he and his friend, Daryl, along with others, "ended up" in a hotel room. Thereafter, they decided to go to Bourbon Street and "ended up walking around Bourbon, and I think Canal Street." Once they arrived in the Bourbon Street area, Defendant saw several people he knew including two girls, Coreyanna and Nana, and stopped to speak with them. While they were talking, the victim, who Defendant had never met before, came up to speak with Nana. At some point thereafter, the victim looked at Defendant, who was standing nearby, and told Nana – "Y'all got this b*tch-a** n*gga around y'all." When Defendant asked if the insult was directed at him, the victim responded affirmatively. Defendant told the victim he was not going "to play … like that" and thereafter, they "just got to fussing…." As the verbal argument escalated, the victim "reach[ed] inside his pants … flashed his gun" and stated: "I'll use this b*tch, I'll use this b*tch." At that point, the victim's friends pulled him away, advising, "No bro, there [are] too many people. Not right here."

Defendant testified that following the victim's threat, he was scared; he thought the victim was going to shoot him. He noted that he had been shot before and "still had trauma from that situation." Thereafter, Defendant went to a hotel lobby for a few minutes to charge his cell phone. Before he left the hotel, "I put a ski mask on … because I didn't want anybody else to … see me" and "didn't want to get into any more altercations." Once outside, he and his friends tried to decide where to go next. Defendant stated that he was ready to leave, but his friends wanted to stay in the area.

Approximately ten minutes after his verbal altercation with the victim, he saw the victim walking in his direction. Defendant testified: "I thought

8

he was looking for me.  I was scared….  I panicked." Defendant stated that he could see the victim and his friends getting closer and "I felt like I was trapped … like I was surrounded….  So that's when I blacked out, and I shot."  Defendant said he thought he was "either going to get jumped, or potentially shot." He stated that he "just pulled the gun out, and I shot twice." Defendant testified that when he shot, he was not aiming at the victim; he was not trying to "hit" the victim.  It was not until the following day that he learned he had shot someone.

After the shooting, Defendant "took off running." However, he only "made it, like, a couple [of] feet" before he slipped.  After a few seconds, he "got back up and … began to run again" and that was when a police officer "tackled" him. Defendant explained that the officer "ended up slamming me, and my head hit [a] pole."  At that point, his gun fell to the ground and the officer "placed his knee on my back, and he got the gun." As a result of this interaction, Defendant sustained "a knot on [his] head."

The officer arrested Defendant at which point, he said "I just got to saying all type[s] of things that weren't true."  Defendant explained that he started lying because he "was scared to go to jail."  At that time, Defendant did not know that he would ultimately be charged with murder; he did not know that anyone had been hurt.  When he learned that he had been charged with second degree murder, he "felt like a bad person … [b]ecause I never wanted to do that."  Defendant stated that he regretted firing his gun; he "made a mistake" and was "sorry to everybody who I hurt…." It was not his intent to kill the victim.

On cross-examination, Defendant confirmed that after firing his gun twice, he fled the scene.  Further, he admitted that when the police officer "grabbed" him, he "struggled," attempting to resist apprehension.

Additionally, Defendant admitted that he initially lied, telling the police officer that he did not have a gun. Defendant also admitted lying to police when he told them that he thought "somebody shot at me." Defendant also falsely told police that "people [were] out here shooting, I ran. What was I supposed to do?" Defendant admitted that he was the only person who fired shots.

Defendant estimated that he was "like a foot or two away" from the victim when he raised his arm and fired his gun. Defendant also confirmed that the victim was not looking at him when he fired his weapon; the victim was walking away from him. Defendant admitted that the victim did not see him fire his gun.

Although the surveillance video showed Defendant raising his arm and pointing the gun in a forward direction, Defendant maintained that he blacked out and was not intentionally aiming the gun at anyone. Defendant was asked: "[I]f you're not intentionally trying [to] point the gun at anyone and just happened to point it at [the victim], why not just point the gun up in the sky? Or at the ground? Just to scare everybody." Defendant responded: "Like I said, I blacked out. I wasn't thinking."

**Christin Wagner**

Christin Wagner ("Ms. Wagner") testified that she worked at the Louisiana Center for Children's Rights as a staff investigator. She stated that she was initially assigned to investigate the instant matter and as part of that investigation, on December 5, 2022, she searched for surveillance footage reflecting the initial confrontation between Defendant and the victim, when the victim allegedly "flashed" a gun at defendant. Ms. Wagner, however, was unable to find any pertinent footage, explaining that one of the places she visited, the New Orleans Tourism Center, "dumps" its surveillance every

six days so, by the time she visited, the surveillance from November 26, 2022, the night of the shooting, no longer existed. The other places she visited either did not have surveillance cameras on the exterior or did not have cameras directed toward the location where the initial encounter between Defendant and the victim occurred.

**ERRORS PATENT**

A review of the record pursuant to La. C.Cr.P. art. 920 indicates no errors patent.

**DISCUSSION**

**Assignment of Error No. 1**

As his first assignment of error, Defendant argues that the evidence was insufficient to prove he committed second degree murder; instead, Defendant claims the evidence supported only the responsive verdict of manslaughter.

Generally, when assessing the sufficiency of evidence to support a conviction, the reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, a rational fact finder could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). This review must include the whole record, as a rational fact finder does. *State v. Gibson*, 2015-0682, p. 13 (La. App. 4 Cir. 1/27/16), 186 So.3d 772, 780 (citing *State v. Mussall*, 523 So.2d 1305, 1310 (La. 1988)). "It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence." *State v. Johnson*, 619 So.2d 1102, 1109 (La. App. 4 Cir. 1993) (citing *State v. Rosiere*, 488 So.2d 965, 968 (La. 1986); *see also State v. Gibson*, 2015-0682, p. 13 (La. App. 4 Cir. 1/27/16), 186 So.3d 772, 780 ("[A] reviewing court is not called upon to decide whether it believes

the witnesses or whether the conviction is contrary to the weight of the evidence." (quoting *State v. Smith*, 600 So.2d 1319, 1324 (La. 1992)). Credibility determinations, as well as the weight to be attributed to the evidence, fall soundly within the province of the fact finder. *State v. Brumfield*, 1993-2404, pp. 5-6 (La. App. 4 Cir. 6/15/94), 639 So.2d 312, 316.

Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). When a defendant commits a homicide that would be first or second degree murder "in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection[,]" it is manslaughter. La. R.S. 14:31(A). "Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]" *Id.* "Sudden passion" and "heat of blood" are not elements of manslaughter. *State v. Snyder,* 1998-1078, p. 4 (La. 4/14/99), 750 So.2d 832, 837. Rather, "they are mitigatory factors in the nature of a defense . . . ." *Id.* A defendant bears the burden of showing by a preponderance of evidence that he acted in "sudden passion" or "heat of blood" in order to be entitled to a manslaughter verdict. *State v. Bowens,* 2014-0416, p. 5 (La. App. 4 Cir. 12/10/14), 156 So.3d 770, 774. In reviewing a claim that a homicide was committed in "sudden passion" or "heat of blood," a reviewing court "must determine whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that these mitigating factors were not established by a preponderance of the evidence by the defendant." *Id.* (citing *State v. Lombard,* 486 So.2d 106, 110-11 (La. 1986).

Defendant asserts that the state failed to show that he possessed the specific intent to kill the victim. According to Defendant, "during the commission of a negligent discharge of a firearm, [the victim] was killed without any intent."

"Specific intent is a state of mind that need not be proven as fact but may be inferred from circumstances and the actions of the defendant." *State v. Smith,* 2006-0318, p. 5 (La. App. 4 Cir. 11/21/06), 946 So.2d 218, 221 (citing *State v. Bailey,* 2000-1398 (La. App. 5 Cir. 2/14/01), 782 So.2d 22, 24). "Whether a criminal defendant possesses the requisite intent is for the trier of fact, and a review of the correctness of that determination is guided by the *Jackson* standard." *State v. Handy,* 2014-1015, p. 8 (La. App. 4 Cir. 12/10/14), 156 So.3d 785, 790 (citations omitted). "Both the Louisiana Supreme Court and this Court [the Louisiana Fourth Circuit Court of Appeal] have held that specific intent to kill can be inferred by pointing and firing a gun at a person." *State v. Cooks,* 2011-0342, p. 16 (La. App. 4 Cir. 12/14/11), 81 So.3d 932, 942 (citing [*State v.*] *Bridgewater*, *on rehearing,* 2000-1529, p. 3 [(La. 1/15/02)], 823 So.2d [877], 910; *State v. Seals,* 1995-0305, p. 6 (La. 11/25/96), 684 So.2d 368, 373; *State v. Scott,* 2009-0138, p. 8 (La. App. 4 Cir. 11/18/09), 26 So.3d 283, 289, *writ denied,* 2009-2773 (La. 6/18/10), 38 So.3d 320; *State v. Collor,* 99-0175, p. 10 (La. App. 4 Cir. 4/26/00), 762 So.2d 96, 102).

Here, Defendant admitted that he shot at the victim two times as the victim was walking away from him. The video also shows Defendant raise his arm, point the gun, and open fire. Therefore, a rational finder of fact could have determined that that the shooting was intentional and not a negligent discharge of a firearm.

In an effort to show on appeal that he acted in sudden passion or the heat of blood, Defendant argues that he and the victim crossed paths again "only a few minutes" after he and the victim exchanged harsh words and the victim allegedly threatened him. However, a review of Defendant's trial testimony reflected that more than a few minutes passed. In fact, Defendant stated that following his first encounter with the victim, he went to a hotel to charge his cellphone. Defendant estimated that ten minutes elapsed between their first encounter and when Defendant saw the victim walking in his direction -- sufficient time for a rational juror to conclude that an average person's blood would have cooled before Defendant shot and killed the victim. *See State v. Dozier,* 553 So.2d 911, 914 (La. App. 4th Cir. 1989) (citing *State v. Landry,* 499 So.2d 1320 (La. App. 4th Cir. 1986) (After the victim struck the defendant once, the victim "turned his attention away from [the defendant], and several minutes passed before [the defendant] shot the victim. A rational trier of fact could have believed that this was sufficient time for [the defendant's] blood to cool." Thus, viewing the evidence in a light most favorable to the prosecution, "we find that a rational trier of fact could have found that the mitigating factors were not established by a preponderance of the evidence" so as to warrant the reduction on appeal of a second degree murder conviction to manslaughter).

Moreover, the cases cited by Defendant in support of his argument that he should have been convicted of manslaughter rather than second degree murder are distinguishable from the matter at hand. Defendant first cites to *State v. Lombard,* 486 So.2d 106 (La. 1986), wherein the Louisiana Supreme Court found that the evidence established sudden passion or heat of blood sufficient to require a reduction of the jury's verdict of second degree murder to manslaughter. However, in *Lombard,* the defendant killed the

victim while they were engaged in a physical fight. As the Louisiana Supreme Court explained:

> Defendant did not unsheathe his knife (the weapon used to kill the victim) until after he had been punched, thrown against a metal rail, knocked onto the cement ground, and put into a stranglehold with his left arm wrenched behind his back. After being placed in this position, in a panic, he lashed out with his knife.

*Id.,* 486 So.2d at 111.

Here, Defendant and the victim were not engaged in a physical altercation when Defendant shot and killed the victim. As noted above, Defendant testified the victim was not looking at him and had walked passed Defendant when he fired the weapon. Defendant therefore was not in immediate danger at the time.

Another case, *State v. Hawkins,* 631 So.2d 1288 (La. App. 4 Cir. 1/27/94), cited by Defendant, wherein this Court vacated a verdict of attempted second degree murder, is also distinguishable from the instant case. In *Hawkins,* at the time of the shooting, the victim and the defendant were actively engaged in a verbal altercation stemming from a vehicular collision. *Hawkins* did not point his gun and fire at the victim. Instead, he "chose to shoot bullets into and around the victim's van." *Id.*, 631 So.2d at 1290. This Court concluded that such action "was indicative of [an] intent to damage the victim's property, not kill the victim." *Id.* As such, the *Hawkins* Court found the evidence sufficient to support only a guilty verdict to the responsive verdict of aggravated battery, rather than attempted second degree murder or attempted manslaughter. *Id.* at 1291.

In the case at hand, contrary to *Hawkins*, Defendant shot directly at the victim. While Defendant claimed he had no intent to kill the victim, he was asked that if that was not his intent, why did he fire the weapon in the

15

victim's direction; "why not just point the gun up in the sky? Or at the ground? Just to scare everybody." Defendant could provide no explanation; he simply stated that he "blacked out."

Viewing the evidence in the light most favorable to the prosecution, a rational fact finder could have found Defendant guilty beyond a reasonable doubt of second degree murder. Accordingly, Defendant's claim that the evidence was insufficient to support his conviction of second degree murder lacks merit.

**Assignment of Error No. 2**

As his second assignment of error, Defendant argues that the trial court erred in denying his motion for a new trial or, alternatively, failing to conduct an evidentiary hearing, based on the affidavit of alternate juror, J.S.

La. C.Cr.P. art. 858 limits appellate review of the trial court's ruling on a motion for new trial. *State v. McKinnies*, 2013-1412, p. 9 (La. 10/15/14), 171 So.3d 861, 869. Therefore, appellate courts "review the trial court's ruling on the new trial motion only for legal error." *Id*. Additionally, the decision on a motion for new trial rests within the sound discretion of the trial court. *State v. Brisban*, 2000-3437, p. 12 (La. 2/26/02), 809 So. 2d 923, 931.

This Court in *State v. Riley*, 2023-0040, p. 20 (La. App. 4 Cir. 8/31/23), 372 So.3d 77, 90, recently summarized the standard and burden of proof on a motion for new trial as follows:

> "Neither the appellate nor supervisory jurisdiction of the supreme court may be invoked to review the granting or the refusal to grant a new trial, except for error of law." La. C.Cr.P. art. 858. "[T]he trial judge has much discretion in ruling on a motion for a new trial and, upon review, an appellate court may only set aside the judgment upon a finding that the trial judge exercised his discretion in an arbitrary manner." *State v. Williams*, [20]17-0544, p. 29 (La. App. 4 Cir. 3/14/18), 240 So.3d 355, 371 (quoting *State v. Chambers*, [20]16-0712, p. 12

(La. App. 4 Cir. 2/15/17), 212 So.3d 643, 650). Thus, legal determinations such as the denial of a motion for new trial, are reviewed under an abuse of discretion standard. *State v. Guillory*, [20]10-1231, p. 4 (La. 10/8/10), 45 So.3d 612, 615. "A defendant bears the burden of proof when seeking a new trial as a result of his conviction, previously obtained by the prosecution." *State v. Armstead*, [20]14-0036, p. 25 (La. App. 4 Cir. 1/28/15), 159 So.3d 502, 519. "When the allegations of a motion for new trial are not supported by proof, a [district] judge properly overrules the motion." *State v. McKinnies*, [20]13-1412, p. 11 (La. 10/15/14), 171 So.3d 861, 870 (citing *State v. Bueche*, 243 La. 160, 186, 142 So.2d 381, 390 (La. 1962); *State v. Slack*, 227 La. 598, 602, 80 So.2d 89, 90 (La. 1955); *State v. Roberson*, 159 La. 562, 568, 105 So. 621, 623 (La. 1925)). "Allegations raised in the motion alone are not sufficient, as a defendant has the burden to show that an injustice has been done to him." *Id*. (citing La. C.Cr.P. art. 851).

*Id*.

In her affidavit, filed under seal, alternate juror J.S. swore that some of the jurors may have observed the computer screen located on the prosecutor's table which displayed an Instagram account of a black teenage boy. J.S. stated that no social media evidence was ever admitted into evidence.

J.S. also attested that one of the jurors fell asleep during the trial and specifically had slept through jury instructions. J.S. further swore that several of the jurors, contrary to the trial court's instructions, were conversing about the case during breaks and that some jurors, including the foreperson, reached a decision regarding Defendant's guilt before the close of trial.

Defendant argues that the above allegations of jury misconduct in J.S.'s affidavit show that Defendant was deprived of the fundamental rights to due process and a trial by a fair and impartial jury. Defendant notes that J.S.'s statement regarding the Instagram account shows that some jurors were potentially exposed to inadmissible prejudicial information.

In its brief, however the State argues that all of Defendant's claims related to the alternate juror's affidavit should be dismissed on appeal as the issues are not a part of the trial record. The State instead asserts that post-conviction relief would be the more appropriate avenue to review Defendant's claims as a full evidentiary hearing could be conducted.

With regard to J.S.'s first allegation of jury misconduct pertaining to the social media evidence, the affidavit does not specify what the Instagram photo/profile of the "black teenage boy" actually depicted. However, Defendant's brief suggests that Instagram photo was of Defendant "posing with guns."

The United States Supreme Court, generally, has provided that evidence "against a Defendant shall come from the witness stand in a public courtroom…." *Turner v. State of La.,* 379 U.S. 466, 473, 85 S.Ct. 546, 550, 13 L.Ed.2d 424 (1965). Also, "[i]f a defendant is able to demonstrate, by preponderance of credible evidence, through juror testimony, that [a] juror was exposed to extrinsic evidence, a presumption of prejudice becomes operative that can be overcome by showing that the error was harmless." *State v. Turner,* 2016-1841, p. 85 (La. 12/5/18), 263 So.3d 337, 393 (citation omitted); *see also State v. Celestine,* 2000-2173, p. 8 (La. App. 4 Cir. 2/13/02), 811 So.2d 44, 49.

Here, there is no evidence that actually shows that any other juror aside from the alternate saw the allegedly prejudicial information on the prosecution's laptop.[1] Moreover, even if a juror did observe an Instagram

---

[1] Defendant suggests that based on the affidavit of J.S. that the exposure of the jurors to the Instagram account occurred prior to a bench conference where the State attempted to get the picture of Defendant into evidence. The transcript reflects that on cross-examination, the State asked Defendant about whether the gun he used to shoot the victim was the first gun he had ever had and whether he had ever possessed a gun prior to the shooting. The defense objected to both lines of questioning and the trial court sustained the objections. After an off-the-record bench conference was conducted, no

post of Defendant in possession of a gun, Defendant did not refute that he had a gun; testified that he obtained a gun sometime prior to the incident; and conceded in his brief that the evidence at trial proved manslaughter. Thus, whether or not the social media evidence was improperly viewed by members of the jury, it was established that Defendant had possession of and had access to a gun. Moreover, Defendant admitted to firing the shots that ultimately killed the victim. Accordingly, the guilty verdict was surely unattributable to the alleged viewing of the social media evidence. As such, any error on part of the trial court was harmless in this regard.

Furthermore, as argued by the State, Defendant's complaints about jury misconduct are more suitably addressed in post-conviction proceedings. An application for post-conviction relief "allows for the presentation of claims that could not be addressed on direct review, including … juror misconduct, or any other cognizable ground that relies on evidence outside the trial record." *State v. Ballard*, 2020-0617, p. 2, n. 3 (La. App. 4 Cir. 7/21/21), 325 So.3d 450, 456 (quoting *State v. Harris*, 2018-1012, p. 17 (La. 7/9/20), 340 So.3d 845, 857). "This is because post-conviction relief creates the opportunity for a full evidentiary hearing under La. C.Cr.P. art. 930." *State v. Sims*, 2017-0101, p. 14 (La. App. 4 Cir. 11/15/17), 231 So.3d 742, 753 (citing *State v. Ellis,* 42,520, p. 19 (La. App. 2d Cir. 9/26/07), 966 So.2d 139, 150). Thus, the jurors could arguably be questioned as to whether they saw the extraneous social media evidence in post-conviction proceedings.

As to the second issue of jury misconduct of a sleeping juror during trial, the "leading case on the issue" is *State v. Cass*, 356 So.2d 396 (La.

---

further questions were posed regarding Defendant's alleged prior possession of guns. However, this colloquy does not necessarily establish that the State at that time was attempting to introduce the Instagram photo or that other jurors had observed the photo.

1977). *See State v. Brown,* 2023-01715, p. 8 (La. 12/13/24), --- So.3d ----, ---- 2024 WL 5102920, *5. In *Cass*, the trial court noted the "juror's head was hanging low, often-times bobbing or nodding, and his eyes were closed." *Cass*, 356 So.2d at 397. After a few minutes, the trial court ordered the removal of the juror and replaced him with an alternate. The juror, before exiting the courtroom, stated twice he had not been sleeping. The Louisiana Supreme Court, found that the trial court erred in removing a juror who "briefly doze[d] off," finding that such evidence was not "per se proof of inability to perform, or any character of disqualification." *Id*. at 398; *see also* La. C.Cr.P. art. 789 (providing that alternate jurors shall replace jurors who become "unable to perform or disqualified from performing their duties.").

However, the *Cass* Court observed that "[h]ad the juror been shown to have been sleeping through a substantial part of the trial or had he been unable to stay awake despite warnings or efforts to arouse him … we would be presented with a substantially different question for review." *Cass*, 356 So.2d at 398.

Here, aside from the allegations of J.S., there is no evidence to show that a juror was asleep during a substantial portion of the trial nor evidence of persistent inability of the juror to stay awake despite several efforts of the trial court.[2] Moreover, evidence of a sleeping juror would not automatically

---

[2] There is one point during the testimony of Mr. McElrath, where the trial court took a short recess after conversing with a juror but it is not clear that that juror was actually asleep. The transcript provides:

> THE COURT: You okay?
> JUROR: Yeah.
> THE COURT: You need a cup of coffee? All right we can take a five minute break and stretch our legs. Anyone need to break? All right. Five minute break. You know stretch our legs.

Additionally, there was no mention of a sleeping juror by the State, the defense, or the trial court during the trial proceedings.

call for a removal of said juror nor mandate the reversal of Defendant's conviction. Defendant's allegations of misconduct do not warrant a remedy on his direct appeal. However, Defendant is permitted to raise this argument in his post-conviction application.

Finally, J.S. asserted that some of the jurors reached their determination that Defendant was guilty after seeing the video footage of the shooting prior to deliberations and that some jurors discussed the evidence during breaks.

In *State v. McKemie, unpub.*, 2008-2093 (La. App. 1 Cir. 9/11/09), 2009 WL 3030743, *8, defense counsel, following trial, "received a letter from one of the jurors informing him that during a trial recess, in the deliberation room, an unnamed juror expressed her belief that the defendant was guilty." Similarly, in *State v. Quiambao,* 36,587, p. 10 (La. App. 2 Cir. 12/11/02), 833 So.2d 1103, 1109, after trial defense counsel "received a letter from [the jury foreman] alleging, *inter alia,* that individual jurors were discussing the facts of the case during breaks in the trial, contrary to the court's instructions and before they received the case for deliberation."

In both *McKemie* and *Quiambao*, the appellate courts, relying on the "jury shield law" found in La. C.E. art. 606(B), determined that an evidentiary hearing was not warranted as the jurors were prohibited from offering testimony. In their analyses, both courts cited La. C.E. art. 606(B), which provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether

extraneous prejudicial information was improperly brought to the jury's attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

*McKemie,* 2009 WL 3030743 at *9; *Quiambao,* 36,587, pp.10-11, 833 So.2d at 1109-1110.

Based upon the above provision, the *McKemie* Court reasoned:

The prohibition contained in Article 606B … is intended to preserve the finality of jury verdicts and the confidentiality of discussions among jurors. *See State v. Graham,* 422 So.2d 123, 136 (La. 1982). Only well-pleaded allegations of prejudicial juror misconduct violating a defendant's constitutional rights will require an evidentiary hearing at which jurors shall testify. Unless such pleadings are made with particularity, jury members are not competent to testify. *See State v. Duncan,* 563 So.2d 1269, 1272 (La. App. 1 Cir. 1990) (Defendant's well-pleaded allegation of prejudicial juror misconduct was sufficient to overcome the prohibition against a juror testifying).

The language of Article 606B permits a juror to testify regarding whether any outside influence was improperly brought to the jury's attention. The trial court did not abuse its discretion in excluding evidence of alleged misconduct in this case. Communications among jurors, although violating the trial court's instruction, do not amount to "outside influences" or "extraneous" information…. [The defendant] argues that one or more of the jurors might have improperly influenced other jurors by expressing his opinion at an inappropriate time and that the jurors were not diligent in deliberating. The factors that lead a juror to his decision are squarely within the prohibition of Article 606B against juror testimony: "a juror may not testify ... to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict ... or concerning his mental processes ... therewith...."

*McKemie,* 2009 WL 3030743, *9.

Similarly, in *Quiambao,* the Second Circuit stated:

The jurors' discussion of the facts among themselves, although in violation of the trial court's instructions, was not shown to inject into the proceedings any outside influence or extraneous prejudicial information. The district court was not plainly wrong to find that the jury foreman's letter does not meet the exception of art. 606B and to exclude his testimony. *State v. Graham,* 422 So.2d 123 (La. 1982), *cert. dismissed,* 461 U.S. 950, 103 S.Ct. 2419, 77 L.Ed.2d 1309; *State v. Horne,*

28,327 (La. App. 2 Cir. 8/21/96), 679 So.2d 953, *writ denied,* 96-2345 (La. 2/21/97), 688 So.2d 521.

*Quiambao,* 36,587, p. 11, 833 So.2d at 1110.

Because conversation among jurors, while violating the trial court's instruction, does not amount to extraneous prejudicial information or outside influence, Defendant's argument regarding J.S's attestations of intra-juror communication discussing evidence/opinions do not warrant this Court's intervention.

In summary, the trial court did not abuse its discretion in denying the motion for new trial and in declining the alternative request for hearing. There is no proof that a sitting juror was exposed to the alleged extraneous social medial evidence (the Instagram photograph of Defendant allegedly in possession of weapons) and any error in that regard is harmless. Further, there is no record of a juror sleeping through a substantial part of the trial in the transcript. Further, J.S.'s allegations of a prejudicial Instagram photograph and the sleeping juror are more appropriately addressed in post-conviction proceedings wherein Defendant could obtain a full evidentiary hearing. Moreover, with regard to J.S.'s attestation of juror communications, such communications, though violative of the trial court's instruction, do not fall within the exception set forth in La. C.E. art. 606(B). As such, Defendant's second assignment of error lacks merit.

**Assignment of Error No. 3**

Defendant argues that the trial court erred in allowing the State, in voir dire and in closing argument, to "emphasize and mischaracterize the possibility of parole as a sentencing option for second degree murder," and by "instructing the jury on the possibility of parole and the possible sentences for lesser verdicts."

23

The record provides that prior to the commencement of trial, the trial court ruled that the jury could be instructed regarding the sentence faced by Defendant if convicted of second degree murder -- a mandatory life sentence with parole eligibility after twenty-five years.[3] On December 5, 2023, Defendant renewed his motion to prohibit the State from informing the jury of his parole eligibility, the trial court denied his renewed motion and Defendant noted his objection.

Defendant is presently challenging the trial court's ruling, claiming he was prejudiced because it suggested he would only serve twenty-five years if convicted. According to Defendant, his potential parole eligibility (and possible release on parole) was too attenuated a consideration for jurors to

_____

[3] La. R.S. 14:30.1(B) provides: "Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence." However, the punishment provision set forth in La. R.S. 14:30.1(B) is modified by La. R.S. 15:574.4(F)(1) when the person found guilty of second degree murder is a juvenile. La. R.S. 15:574.4(F)(1) provides, in pertinent part:

Notwithstanding any provision of law to the contrary … any person serving a sentence of life imprisonment for a conviction of second degree murder (R.S. 14:30.1) who was under the age of eighteen years at the time of the commission of the offense and whose indictment for the offense is on or after August 1, 2017, shall be eligible for parole consideration if all of the following conditions have been met:
   (a) The offender has served twenty-five years of the sentence imposed.
   (b) The offender has not committed any major disciplinary offenses in the twelve consecutive months prior to the parole hearing date. A major disciplinary offense is an offense identified as a Schedule B offense by the Department of Public Safety and Corrections in the Disciplinary Rules and Procedures for Adult Offenders.
   (c) The offender has completed the mandatory minimum of one hundred hours of pre-release programming in accordance with R.S. 15:827.1.
   (d) The offender has completed substance abuse treatment as applicable.
   (e) The offender has obtained or completed at least one of the following:
      (i) A literacy program.
      (ii) An adult basic education program.
      (iii) A job skills training program.
      (iv) A high school equivalency certificate.
   (f) The offender has obtained a low-risk level designation determined by a validated risk assessment instrument approved by the secretary of the Department of Public Safety and Corrections.
   (g) The offender has completed a reentry program to be determined by the Department of Public Safety and Corrections.

be permitted to hear about it. Instead, the jurors should have been concerned only with whether or not Defendant was guilty.

In support of his argument, Defendant asserts that a jury may be informed of a defendant's mandatory sentence only at the request of the defendant and since Defendant made no such request, such information was not permitted. However, the case cited by Defendant, *State v. Jackson*, 450 So.2d 621 (La. 1984), does not support that assertion. Instead, the *Jackson* Court provided: "When the penalty imposed by the statute is a mandatory one, the trial judge *must* inform the jury of the penalty *on request of the defendant* and must permit the defense to argue the penalty to the jury." *Jackson,* 450 So.2d at 633 (citing *State v. Hooks,* 421 So.2d 880 (La. 1982); *State v. Washington,* 367 So.2d 4 (La. 1978)) (emphasis added). However, the *Jackson* Court added that in other situations, where the statutory penalty is not mandatory and no request is made by the defendant, information regarding the penalty faced by the defendant if convicted is not prohibited. Instead, "the decision to permit or deny an instruction or argument on an offense's penalty is within the discretion of the trial judge." *Jackson,* 450 So.2d at 633-634 (citing *State v. Williams,* 420 So.2d 1116 (La. 1982); *State v. Dawson,* 392 So.2d 445 (La. 1980); *State v. Carthan,* 377 So.2d 308 (La. 1979); *State v. Blackwell,* 298 So.2d 798 (La. 1974) (on rehearing), *cert. denied,* 420 U.S. 976, 95 S.Ct. 1401, 43 L.Ed.2d 656 (1975)). It was thus within the trial court's discretion to allow an instruction on the sentence faced by Defendant in the present case.

Next, Defendant cites *State v. Jones,* 639 So.2d 1144 (La. 7/5/94), to support his claim that he was denied due process as a result of the jury being informed that if convicted, he faced a mandatory life sentence with the possibility of parole after serving twenty-five years.

However, *Jones* was a capital case and the issue was whether the jury should be informed of the governor's power to grant reprieve, pardon or commutation of the defendant's sentence and is thus distinguishable from the present case. The *Jones* Court held that La. C.C.P. art. 905.2(B), which required the trial court to instruct the jury in a capital trial on the commutation powers of the governor, unconstitutional. *Jones*, 1994-0459, p. 13, 639 So.2d at 1153. Moreover, *Jones* was subsequently superseded by Constitutional Amendment and La. C.Cr.P. art. 905.2(B) was reintroduced and is now law. *See State v. Loyd,* 1996-1805, pp. 3-4 (La. 2/13/97), 689 So. 2d 1321, 1324; *see also* La. Const. art. I, § 16.

Additionally, as argued by the State, the governor's power of clemency is more speculative than the requirements necessary for parole eligibility under La. R.S. 15:574.4(F)(1). The *Jones* Court observed: "The executive clemency power can be and, admittedly, has been misused by the granting or denying of pardons, commutations and reprieves based on political motivations or favoritism." *Jones,* 639 So.2d at 1150. Parole eligibility under La R.S. 15:574.4, on the other hand, is specifically linked to the offender's age and the conviction of second degree murder. As such, Defendant's reliance on *Jones* is therefore misplaced and is inapplicable to the case at bar.

Defendant also cites *State v. Guidry,* 2016-1412 (La. 3/15/17), 221 So.3d 815, to support his claim that the jury being informed of his parole eligibility was improper. In *Guidry,* the State filed a motion *in limine* to exclude the dissemination of information to the jury of the possible sentence the defendant could face as a habitual offender. The trial court denied the State's motion and the court of appeal denied the State's writ application. The Louisiana Supreme Court, however, granted writs and held that the trial

26

court could not allow the defendant to inform the jury in argument of "the mandatory minimum sentence the defendant could be subject to under the Habitual Offender Law should the State seek to enhance his sentence under that law and should the court find the State has proved all of the elements to warrant enhancement of the sentence." *Guidry,* 2016-1412, p. 1, 221 So.3d at 816. The Court found such information "too attenuated from the guilt phase of trial to be discussed before a jury…." *Id.*

*Guidry*, however, like *Jones*, is distinguishable because in the instant case a defendant's parole eligibility is clear should the defendant meet the enumerated conditions set forth in La. R.S. 574.4(F)(1). The same cannot be said with respect to a defendant's sentencing under the multiple offender statute, La. R.S. 15:529.1. As the *Guidry* Court reasoned:

> A multiple offender bill is generally not filed until after conviction, such that it does not logically constitute the "law of the case" for the subject offense at trial as it pertains to the scope of the jury's duty as the factfinder. The jury has no role in the enhancement of a sentence under the Habitual Offender Law, because once the multiple offender bill is filed after conviction, the adversarial hearing is conducted before the judge and the State must prove to the judge the allegations in the multiple offender bill. The principle that legal matters irrelevant to guilt should not be pressed upon the jury … applies even more forcefully in the context of the Habitual Offender Law. It is axiomatic that, if the trial court has not yet conducted a sentencing hearing, any sentence as a multiple offender is speculative and indeterminate. As the *Guillard* court noted, "a possible adjudication as a habitual offender is a separate proceeding that punishes one for his status as a recidivist, not for the most recent conviction. [*State v. Guillard*,] [19]98-0594, p. 9 [(La. App. 4 Cir. 4/7/99),] 736 So.2d [273,] 278-79. Thus, the defendant's status as a putative multiple offender is irrelevant to the determination of guilt or innocence of the tried offense. Allowing the jury to be informed of the potential mandatory minimum sentences if and when the defendant is proven to be a second, third, or fourth felony offender has the potential to shift the focus of the jury from a determination of guilt or innocence to issues regarding sentencing. Such a shift would likely confuse the issues for which the jury is responsible and invite jurors to speculate about sentencing, including why a particular defendant is facing such a term of imprisonment. In sum, the issue of possible

mandatory minimum sentences that could be imposed if the State successfully pursues enhancement through a multiple offender bill is too far attenuated from the guilt phase of trial to be discussed before a jury.

*Guidry,* 2016-1412, pp. 14-15, 221 So.3d at 824.

Accordingly, the cases Defendant relies upon to support his argument are inapplicable. The trial court in the instant case was entitled in its discretion to instruct the jury on the mandatory sentence imposed by a guilty verdict.  Accordingly, this assignment of error lacks merit.

**Assignment of Error No. 4**

Lastly, Defendant claims that the mandatory minimum sentence he received of life imprisonment with the possibility of parole after serving twenty-five years was excessive.

In *State v. Green,* 2017-0520, p. 3 (La. App. 4 Cir. 11/15/17), 231 So.3d 756, 758, this Court addressed an excessive sentence claim in the context of the imposition of a mandatory minimum sentence, stating:

> The Louisiana Constitution guarantees that "[n]o law shall subject any person to ... cruel, excessive or unusual punishment." That protection allows the judicial branch to determine whether the range of sentences authorized by a criminal statute is excessive for a particular defendant. The court must start with the presumption that a mandatory minimum sentence is constitutional.  In order to rebut that presumption, a defendant must clearly and convincingly prove that he is exceptional. This Court has articulated that exceptional "means that because of unusual circumstances he is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case."
>
> If the mandatory minimum sentence is constitutionally excessive then a downward departure is required under [*State v.*] *Dorthey*, [623 So.2d 1276 (La. 1993)]. "A punishment is constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment and is nothing more than the purposeless imposition of pain and suffering and is grossly out of proportion to the severity of the crime." A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice.

(footnotes omitted).

A trial court is afforded broad discretion in making sentencing decisions and an appellate court will not set aside an imposed sentence if the record supports the sentence imposed. *State v. Bradley*, 2018-0734, p. 8 (La. App. 4 Cir. 5/15/19), 272 So.3d 94, 99-100. Thus, "[t]he relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate." *State v. Mathieu*, 2018-964, p. 4 (La. App. 3 Cir. 11/6/19), 283 So.3d 1041, 1045 (citing *State v. Cook*, 95-2784 (La. 5/31/96), 674 So.2d 957).

In reviewing a claim that a sentence is excessive, an appellate court generally must determine whether the trial judge has adequately complied with statutory guidelines in La. C.Cr.P. art. 894.1 and whether the sentence is warranted under the facts established by the record. *State v. Wiltz*, 2008-1441, p. 10 (La. App. 4 Cir. 12/16/09) 28 So.3d 554, 561. However, even where there has not been full compliance with La. C.Cr.P. art. 894.1, resentencing is unnecessary where the record shows an adequate factual basis for the sentence imposed. *State v. Stukes*, 2008-1217, p. 25 (La. App. 4 Cir. 9/9/09), 19 So.3d 1233, 1250 (citing *State v. Major*, 1996-1214, p. 10 (La. App. 4 Cir. 3/4/98), 708 So.2d 813, 819). Further, La. C.Cr.P. art. 881.4(D) expressly states that an "appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed."

Defendant argues that the trial court "despite the mandatory sentence, should [have] consider[ed] the [La. C.Cr.P. art.] 894.1 guidelines and the circumstances of the case to determine whether a downward departure [was] appropriate."

However, the record supports Defendant's mandatory minimum sentence of life in prison with the possibility of parole after twenty-five years. The video evidence showed and Defendant testified the victim merely walked past when Defendant fired two shots, killing him. The record thus reflects an intentional shooting of the victim.

Moreover, a review of the January 18, 2024 hearing reflects that the trial court took into consideration mitigating factors. The trial court considered written material submitted in support of Defendant and heard testimony from Lee Reisman ("Ms. Reisman"), the superintendent of the Juvenile Justice Intervention Center ("JJIC") where Defendant was incarcerated. Ms. Reisman stated that she had known Defendant for "a little over a year" and described him as "quiet, very smart, very well spoken and really grounded in faith and spirituality, humble." She further stated that Defendant, unlike most of the youths incarcerated in JJIC, "participated in almost all of the activities that [JJIC] offer[ed]." Additionally, the trial court heard testimony from Kenneth Dorsey ("Mr. Dorsey"), the "Transition Coordinator and Justice Coordinator for Travis Hill NOLA." Mr. Dorsey explained that he interacts with juveniles who have "adult charge[s]" lodged against them. Upon meeting Defendant, Mr. Dorsey wondered how he could be incarcerated; how did he get into trouble. Mr. Dorsey, like Ms. Reisman, testified that Defendant expressed remorse over the shooting. Further, like Ms. Reisman, Mr. Dorsey testified that since his incarceration, Defendant has been involved in several activities at Travis Hill, as well as at JJIC.

After listening to the testimony of Ms. Reisman and Mr. Dorsey about Defendant's participation in activities offered at JJIC and Travis Hill, the trial court questioned defense counsel as to why Defendant would be unable to participate in comparable programs following his conviction in this case.

In response, defense counsel explained that she was not stating that Defendant could not participate in such programs while incarcerated; that she was not seeking a sentence that did not require a period of incarceration, but rather sought a sentence "that will ensure that he is able to return to the community someday."

The trial court then listened to defense counsel's argument regarding how Defendant "was not the same child who pulled the trigger on November 27, 2022" as well as a written statement by Defendant. After which, the trial court announced that it was ready to impose a sentence. The trial court stated it found no reason that would warrant a downward departure from the mandatory minimum sentence, reasoning:

> When I listen to what the [d]efense has said and what their witnesses said and I hear things like "that offense" or "that incident" or "that awful situation" or "a mistake" or that "this incident caused a lot of harm," in my mind that minimalizes what actually happened. It wasn't "that offense," it wasn't "an [i]ncident," it wasn't "an awful situation," it wasn't "a mistake," it wasn't "something that caused a lot of harm." It was second degree murder, and that's what the jury found. I think that the courts and the legislature contemplated the possibility of rehabilitation as it relates to juveniles, hence the parole eligibility after a 25 year sentence. When we think about *Dorthey,* it's always about the exceptionality. I would have to have found that this sentence is constitutionally excessive. After hearing the evidence provided by the [d]efense I disagree that a sentence of life imprisonment with the possibility of parole is unconstitutionally excessive. Therefore, I'm denying the [d]efense's motion under *State versus Dorthey*…. While I do find that it's true that the defendant is bright, he's studious and I think he can be rehabilitated, I believe the state legislature…has accounted for this opportunity by creating parole if it is merited. The Parole Board is the best body to decide whether reintegration into society is appropriate after serving the requisite 25 years. Again, I'm finding that under [the] *Dorthey* standard that the sentence of life with the possibility of parole is not constitutionally excessive.

As reflected above, the trial court considered Defendant's circumstances when imposing the mandatory minimum sentence but in light of the specifics of the crime, found the mitigating factors unconvincing.

We cannot say that Defendant's sentence shocks our sense of justice or makes no measurable contribution to acceptable penal goals. As such, the trial court did not abuse its broad discretion when failing to depart from the sentence prescribed by law.

## CONCLUSION

Based on the foregoing, Defendant's conviction and sentence are affirmed.